1                UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLUMBIA

    --------------------------X

3  UNITED STATES OF AMERICA,       Docket No. CR 06-298

4                PLAINTIFF

5       v.              Washington, D.C.

                   **August 22, 2007**

6                   1:50 p.m.

7  SAMUEL H. VINTON,

8              DEFENDANT.

9  --------------------------X

10     **TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION**

      BEFORE THE HONORABLE GLADYS KESSLER

11       UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Plaintiff:   GREENBERG TRAURIG LLP

                   By:  Ms. Precious Murchison

14                   Ms. Angela Schmidt

                  2101 L Street, N.W.

15                  Suite 1000

                  Washington, D.C.  20037

16                  202.331.8511

17  For the Defendant:   ROBERTS & WOOD

                   By:  Ms. Nikki U. Lotze

18                  Berkshire Building

                  6801 Kenilworth Avenue

19                  Riverdale, MD  20737

                  301.699.0764

20

    Court Reporter:      Catalina Kerr, RPR

21                  U.S. District Courthouse

                  Room 6716

22                  Washington, D.C.  20001

                  202.354.3258

23

    Proceedings recorded by mechanical stenography, transcript

24  produced by computer.

25

C O N T E N T S

DEFENDANT RESTS AND BOTH SIDES CLOSE................... 64

CHARGE OF THE COURT READ.............................. 65

CLOSING STATEMENT BY MS. MURCHISON.................... 81

CLOSING STATEMENT BY MS. LOTZE........................ 89

CLOSING STATEMENT BY MS. MURCHISON....................107

FINAL INSTRUCTIONS BY THE COURT.......................115

COURT REPORTER'S CERTIFICATE..........................118

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Aaron Long | | | | |
| By Ms. Lotze | 3 | | 37 | |
| By Ms. Murchison | | 26 | | |
| | | | | |
| Bruce Teixeira | | | | |
| By Ms. Lotze | 42 | | 52 | |
| By Ms. Murchison | | 52 | | |

| EXHIBITS: | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| DEF. 8 | Photo | 22 | 23 |
| DEF. 9 | Photo | 23 | 23 |
| DEF. 15 | Photo | 24 | 24 |

```
 1                        P-R-O-C-E-E-D-I-N-G-S

 2              (1:50 P.M.; OPEN COURT; JURY PRESENT; DEFENDANT

 3   PRESENT WITH HIS ATTORNEY.)

 4              THE DEPUTY CLERK:  Jury panel is all present, Your

 5   Honor.

 6              THE COURT:  Please be seated, everybody.

 7              All right.  Ms. Lotze, your next witness, please.

 8              MS. LOTZE:  Next, Your Honor, if I could call Aaron

 9   Long.

10              THE COURT:  All right, sir.  Would you step up here,

11   please?

12              THE DEPUTY CLERK:  Please remain standing and raise

13   your right hand.

14              (WITNESS SWORN BY THE DEPUTY CLERK.)

15              THE DEPUTY CLERK:  You may be seated.

16                        AARON LONG,

17   having been duly sworn, testified as follows:

18                    DIRECT EXAMINATION

19   BY MS. LOTZE:

20   Q    Good afternoon, Mr. Long.

21   A    Hi, how are you?

22   Q    Fine.  Would you please state and spell at least your

23   first name for our court reporter.

24   A    My name is Aaron Long.  A-a-r-o-n, L-o-n-g.

25   Q    And, Mr. Long, if you need to pull that microphone
```

 1    closer, just feel free.  I think it moves both forward and

 2    back.

 3    A    Okay.

 4    Q    Now, Mr. Long, could you please tell us where you live?

 5    A    I live at 1216 -- 1216 30th Street, Apartment 2.

 6    Q    And in what quadrant of the city is that?

 7    A    In southeast Washington, D.C.

 8    Q    And how long have you lived on 30th Street in

 9    Washington, D.C.?

10    A    Approximately about four, four and a half years.

11    Q    All right.  And where are you employed now?

12    A    I run a music production company in my house.

13    Q    Okay.  When you say a music production company, could you

14    tell us what that is?

15    A    I record -- people come in my house and I record them.

16    Q    Okay.  When they come in your house, what are they doing

17    that you record?

18    A    Their voices and their music.

19    Q    Okay.  Do you have equipment in your home for that

20    purpose?

21    A    Yes, ma'am.

22    Q    What kind of equipment?

23    A    I have a DX 32 XD hard disk recording console.

24    Q    All right.  And before you began operating the music

25    studio, where did you work?

1    A    I worked at D.C. Water & Sewer Authority.

2    Q    For how many years?

3    A    About 15 years.

4    Q    All right.  Let me ask you, Mr. Long, if you know Samuel

5    Vinton.

6    A    Yes, ma'am.

7    Q    And how is it that you know Mr. Vinton?

8    A    He's a church member, and I'm friends -- his uncle is

9    like my best friend.

10    Q    Okay.  When you say he's a church member, do you attend

11    the same church?

12    A    Yes, ma'am.

13    Q    And what's the name of that church?

14    A    Vision of Hope Baptist Church.

15    Q    All right.  I'm going to show you what I've marked and

16    previously shown to the Government as Defense Exhibit No. 6.

17    I think, Mr. Long, if you can see either of the monitors here

18    or the one up on the bench, if you can look at that exhibit

19    with us.  Do you recognize what's depicted in Defense Exhibit

20    6?

21    A    Yes, ma'am.  That's the church that I attend.

22    Q    Okay.  And how many years have you been going to the

23    Vision of Hope Baptist church?

24    A    Maybe about 30 years, 35 years, something like that.

25    Q    And who is the minister there?

1    A    Reverend Hazel Hardy (ph.).

2    Q    And is that person related to Mr. Vinton?

3    A    Yes, ma'am.

4    Q    Who is that to Mr. Vinton?

5    A    That's his grandmother.

6    Q    Okay.  Now, do you know who, if anyone, lives above that

7    Baptist church?

8    A    His grandmother, his mother --

9             MS. MURCHISON:  Objection, Your Honor.

10            THE COURT:  Sustained.  Counsel want to approach

11    now, or if you want to ask your next question, you can.

12            MS. LOTZE:  Sure.

13    Q    (BY MS. LOTZE)  Have you ever been to the apartment

14    above Vision of Hope Baptist Church?

15            MS. MURCHISON:  Objection, relevance.

16            THE COURT:  All right.  Counsel may approach,

17    please.

18            (AT THE BENCH; ON THE RECORD.)

19            THE COURT:  On the previous objection, I allowed you

20    to go beyond.  The fact that he lives over the church, that

21    he's a church member, that his grandparents run the church, I

22    understand the Government's objections, but I'll allow it in.

23    What's this witness going to testify to?  So far he has said

24    nothing relevant.

25            MS. LOTZE:  Yes, Your Honor.  What I'm doing now is

1  establishing how he knows Mr. Vinton.  And the only testimony

2  in the record now with respect to where my client lives is

3  that the police officer said that's the address that's on his

4  license.  I don't know where he lays his head, so why wouldn't

5  it be relevant where Mr. Vinton lives?

6            THE COURT:  I don't think the Government is

7  disputing that.  But, in any event, we have gotten that in

8  through other witnesses.

9            MS. LOTZE:  We haven't.  The only evidence is what

10 Officer Alton said.

11           THE COURT:  No, no, no, wait a minute.

12           MS. LOTZE:  What Officer Alton said is that's what's

13 on his I.D.  I don't know where he lays his head.  It's as

14 good as it got.

15           MS. MURCHISON:  Your Honor, we dealt with the whole

16 search warrant issue, and Officer Alton had testified that he

17 had gone there and he confirmed that.

18           THE COURT:  Your memory is better than mine for the

19 moment.  It's in the record.  Get to the heart of this

20 witness' testimony.  It is definitely in the record that the

21 officer went there with the search warrant, that he knew it

22 was Mr. Alton's home -- I mean, Mr. Vinton's home.

23           MS. LOTZE:  What he said was, "I don't know where he

24 lays his head.  That was what was on his identification."

25 That's what he said.

1          MS. MURCHISON:  There is testimony that he lives

2    there with his mother and his grandparents.

3          MS. LOTZE:  No, there wasn't --

4          MS. MURCHISON:  The testimony she is referring to is

5    whether he sleeps there.  Officer Alton said, "No, I don't

6    know."

7          THE COURT:  What is this witness going to testify?

8          MS. LOTZE:  Where my client lives.  I don't know why

9    that is -- grant you, the Government doesn't like that he

10   lives above the church.  That's just a fact.  It's not in the

11   record yet.

12         THE COURT:  It's obviously a fact that it humanizes

13   your client for the jury, I understand that, makes him

14   likeable.  I understand fully what you're trying to do.  I am

15   not 100 percent sure, Ms. Murchison, that it is in the record.

16         MS. MURCHISON:  Your Honor, I think the officer did

17   say that, you know, he couldn't be sure what he had said.

18         I would just ask for a proffer as to this witness'

19   testimony, because my concern is that by the time he's

20   finished, if he's like the last witness, then it really is

21   back to a character reference.  All that was established

22   through the last witness was that the Defendant was somebody

23   who was employed, a good character show.  The only thing that

24   we've got to with this witness is that now he's a churchgoer.

25         THE COURT:  And that this guy, this man, excuse me,

```
 1   in closing, said -- what is he going to testify to that?
 2              MS. LOTZE:  Your Honor, why should I have to proffer
 3   my evidence?  It would be relevant evidence.  The Government
 4   has no right to preview it.  There is nothing wrong with
 5   introducing how he knows my client.  There is nothing wrong
 6   with that.
 7              THE COURT:  You may introduce that.  I'm not going
 8   to have anymore bench conferences.  I'm going to rule in open
 9   court.  And I am warning you now, I'm not going to let you put
10   on -- as I say, I think I've been pretty generous about it,
11   but I'm not going to let you put on evidence that just makes
12   him a more sympathetic person.  All right.  Let's go.
13              (OPEN COURT.)
14   Q   (BY MS. LOTZE)  Mr. Long, do you know where Samuel
15   Vinton lives?
16   A   Yes, ma'am.
17   Q   And where is that?
18   A   Lives over the top of the church.
19   Q   All right.  And is that the church you identified on the
20   screen?
21   A   Yes, ma'am.
22   Q   All right.  And just for the benefit of the courtroom
23   staff, that exhibit has been admitted.  The monitor is the one
24   on -- the monitor now on.
25              Mr. Long, I want to direct your attention to
```

1    September 9 of last year, 2006, and ask you whether you saw

2    Mr. Vinton on that day.

3    A    Yes, ma'am.

4    Q    All right.  And where did you see him?

5    A    He came to my recording studio.

6    Q    All right.  And your recording studio, what's the address

7    of that studio?

8    A    1216 30th Street.

9    Q    Southeast?

10   A    Southeast, yes, ma'am.

11   Q    All right.  And do you recall at about what time

12   Mr. Vinton came to the studio?

13   A    I would say sometime in the midafternoon.

14   Q    All right.  And for what purpose did Mr. Vinton come to

15   the recording studio?

16   A    Well, he said he had to do some mixing.

17   Q    And did you see whether, in fact, he did some mixing?

18   A    Yes, ma'am.

19   Q    All right.  And tell us how that process goes.  Are you

20   involved in the mixing process?

21   A    At that point in the process, some people like to mix for

22   theirself, because some people don't like the way I -- the way

23   I mix.

24   Q    Okay.  And was Mr. Vinton mixing music for himself or

25   were you helping?

1    A    I would say I was helping.

2    Q    Okay.  Did you see how Mr. Vinton arrived at your studio?

3    A    Yes, ma'am.

4    Q    And how was that?

5    A    He drove his car.

6    Q    What kind of car was Mr. Vinton driving in September of

7    2006?

8    A    Green Maxima.

9    Q    Okay.  And I'll show you what's been admitted as

10   Government's Exhibit -- I show you two Government exhibits,

11   Exhibit No. 3C and 3B.  Because they are easier to see in

12   paper form, I'll just walk them up here to you and ask you

13   whether you recognize the car depicted in Government's 3B and

14   3C as the green Maxima that you saw Mr. Vinton driving.

15   A    The picture -- it looks a little dark, but it looks like

16   that could -- looks a little dark, but I believe that's the

17   car.

18   Q    Okay.  And do you -- about how long did Mr. Vinton stay

19   at your studio on September 9?

20   A    I would say he stayed for about maybe an hour or two.

21   Maybe an hour or so, something like that.

22   Q    Okay.  And during the time that Mr. Vinton -- what

23   happened after the hour or two that Mr. Vinton was there?

24   A    Well, after -- after an hour or two, one of his buddies

25   showed up.

1    Q    Did you see Mr. Vinton's buddy show up?

2    A    Yes, ma'am.

3    Q    Okay.  Do you know how that person arrived?

4    A    No, I was at -- at that point, I was sitting on the porch

5    smoking cigarettes.

6    Q    Okay.  And what happened after Mr. Vinton's buddy showed

7    up?

8    A    He came -- I seen him coming up the street, and he said,

9    "What's up?"

10          And I said, "Hey, man, what's up?"  And I let him in

11    the front door, and I went back to sitting on the porch, you

12    know.

13    Q    Okay.  Do you know this person's name who arrived at your

14    studio?

15    A    Yes, ma'am.

16    Q    What's his name?

17    A    D.  They call him DA.

18    Q    DA?

19    A    Yes, ma'am.

20    Q    Do you know any more of DA's name than DA?

21    A    No, ma'am.

22    Q    All right.  Had you ever seen DA before September 9,

23    2006?

24    A    Yes.

25    Q    And in what context had you seen DA before September 9?

1    A    He's been recording at my studio before.

2    Q    Okay.  Now, on September 9th, when DA arrived, what

3    happened after he showed up?  You said you were sitting on the

4    stairs?

5    A    Yes, ma'am.

6    Q    What happened after that?

7    A    Maybe about -- I can't be real specific, but it was

8    about -- he only stayed for about maybe 10 or 15 minutes.

9    Q    And then what happened?

10    A    He came out the door and he got in his -- Samuel, that

11    car you showed me on the picture -- and he drove off.

12    Q    Now, when you say "he" came out the door, who came out

13    the door?

14    A    DA.

15    Q    And when DA came out the door, he got into Mr. Vinton's

16    car?

17    A    Yes, ma'am.

18    Q    And was Mr. Vinton with him?

19    A    No, he was still in the house.

20    Q    Mr. Vinton was still in your house?

21    A    Yes.

22    Q    Okay.  Did you see how DA got into the car?  Did he have

23    keys?  Did he -- was the door unlocked?

24    A    He had -- he got this key, the key chain thing, and the

25    lights blinked.  And he got in the car and started the car and

1   pulled off.

2   Q   All right.  And was DA alone or with someone else when he

3   pulled off in Mr. Vinton's car?

4   A   He was alone.

5   Q   All right.  Now, where was Mr. Vinton when DA pulled off

6   in Mr. Vinton's car?

7   A   He was still in the house.

8   Q   And what happened after DA left in Mr. Vinton's car?

9   A   He pulled off in his car and --

10  Q   Okay.

11  A   -- at that point I went back in the house and just kept

12  working.

13  Q   Okay.  And was the -- how long after -- Well, did there

14  come a point in time after that that Mr. Vinton also left the

15  studio?

16  A   Yes, ma'am.

17  Q   And how long after DA left in Mr. Vinton's car did

18  Mr. Vinton leave the studio?

19  A   I would say maybe 45 minutes to an hour.  Another car

20  pulled up.

21  Q   Okay.  And when you say "another car pulled up," what do

22  you mean by that?

23  A   It was a light-colored four-wheel-drive truck.

24  Q   All right.  And what happened once that other car pulled

25  out after that truck?

```
 1    A   He said, "Mr. Samuel," he said, "Look, man, I'm going to

 2   get my eat on.  I'm gone.  I'll be back."

 3    Q   Okay.  And how did Mr. Vinton leave after he told you he

 4   was going to get his eat on?

 5    A   He left out the front door and hopped in the passenger

 6   side of the truck, and they pulled off.

 7    Q   Okay.  Did you see who was driving that truck that

 8   Mr. Vinton got into?

 9    A   No, ma'am.

10    Q   Okay.  Was it -- All right.

11        After Mr. Vinton left, and when you say he told you

12   he was going to get his eat on, what does that mean to you?

13    A   He was going to get some food.  He was going to eat or

14   something.

15    Q   And so after Mr. Vinton left and told you he was going to

16   get some food, what happened next?

17    A   Then about an hour after that, DA came back.  And he

18   was -- when DA came back, he was listening to the mix that

19   Samuel had done.

20    Q   When you say, "when DA came back, he was listening to the

21   mix," who was listening to the mix?

22    A   DA.

23    Q   Okay.  So when DA returned, he came into the studio?

24    A   Yes, ma'am.

25    Q   All right.  And, at that point, was Mr. Vinton back from
```

1    eating yet?

2    A    No.

3    Q    Okay.  How long after DA returned to the studio did

4    Mr. Vinton return?

5    A    It was -- at that point, it was dark outside when he came

6    back.

7    Q    At what point was it dark outside?

8    A    When Mr. Vinton returned back, it was getting kind of

9    dark.

10   Q    Okay.  Now, when Mr. Vinton returned to the studio, was

11   DA still there?

12   A    Yes, ma'am.

13   Q    All right.  And did you see how Mr. Vinton got his keys?

14   A    He came in.

15   Q    Who came in?

16   A    Mr. Vinton.

17   Q    Uh-huh.

18   A    He came in.  He said, "Look, man, I've got to go pick up

19   this girl, and I'll be right back."

20            And DA -- it was like DA, "Yeah, make sure you come

21   right back."

22   Q    Okay.  Then what happened?

23   A    Then he left.

24   Q    Then who left?

25   A    Mr. Vinton.

1    Q    Okay.  And how -- you say that Mr. Vinton said he would

2    be right back.  Did he come right back?

3    A    No, ma'am.  He never returned back.

4    Q    All right.  Did you see him again that night?

5    A    No, ma'am.

6    Q    Now, on the next -- did you -- and I don't want you to

7    tell us how you found out, but I want to just ask:  Did you

8    eventually learn that Mr. Vinton was arrested later that

9    evening?

10   A    Well, yes, ma'am.

11   Q    All right.  And after -- well, before you learned that,

12   did you have occasion to see Mr. Vinton's car at all?

13   A    Yes.

14   Q    Where did you sea Mr. Vinton's car next?

15   A    The church van comes to pick us up on Sunday.  And when

16   we was going back around to the church, I seen Mr. Vinton's

17   car.  And I said, "Oh, man, he must be playing for another

18   church."

19   Q    Why would you think he was playing for another church?

20   A    Because he --

21        MS. MURCHISON:  Objection, Your Honor.

22        THE COURT:  Sustained.

23   Q    (BY MS. LOTZE)  What's -- does Mr. Vinton play an

24   instrument for your church?

25        MS. MURCHISON:  Objection, Your Honor.

```
 1              THE COURT:  Sustained.
 2   Q   (BY MS. LOTZE)  Let me show you what has been admitted
 3   as Defense Exhibit No. 5.
 4              MS. LOTZE:  Now, if I could just get the Court's
 5   assistance in turning the monitor on so the jury can see this.
 6              THE DEPUTY CLERK:  It's not on?
 7              MS. LOTZE:  No.
 8              THE DEPUTY CLERK:  It's on.
 9              MS. LOTZE:  Thank you.
10   Q   (BY MS. LOTZE)  All right.  Now, Mr. Long, are you able
11   to see Defense Exhibit 5 from where you sit?
12   A   Yes, ma'am, I can see it from the --
13   Q   All right.  And do you recognize the area that's depicted
14   in Defense Exhibit No. 5?
15   A   Yes, ma'am.
16   Q   What street is that that we're looking at in the
17   forefront there where my finger is tracing?
18   A   That's Minnesota Avenue.
19   Q   And what street is this that's intersecting with
20   Minnesota Avenue?
21   A   That's the -- that's where the church van makes the turn
22   off of Minnesota Avenue.
23   Q   Okay.  And were you on -- you said the church van comes
24   to pick you up.  I'm assuming that's on a Sunday?
25   A   Yes, ma'am.
```

1  Q    And when, in relation to the events you testified, was

2  that?  Was it the next day, two days later?  Tell us when that

3  was.

4  A    That would have been the 10th.

5  Q    Okay.  So the next morning?

6  A    Yes, ma'am.

7  Q    And the next morning, where did the church van take you

8  that you happened to see Mr. Vinton's car?

9  A    Well, when we turned off of Minnesota Avenue, I seen his

10  car about where that -- there is a little white dot right

11  there.

12  Q    And if you want to step down, Mr. Long, you can actually

13  use your finger and show the jury where the van took you, if

14  you are using this exhibit.

15  A    (Witness steps down.)

16  Q    So looking at Defense Exhibit 5 --

17  A    We came this way (indicating) down Minnesota Avenue.  We

18  made that turn right there (indicating), where the street goes

19  right here (indicating).

20  Q    Yeah.

21  A    His car was right there on that corner.

22  Q    Let me show you perhaps a better Defense Exhibit No. 3.

23  Do you recognize what's shown in that photograph?

24  A    Yes, ma'am.

25  Q    And is that a picture further along the street?

1    A    That's like at the corner, but his car was parked right

2    here at this corner right here (indicating).

3    Q    Okay.  So the -- so show us with your finger on that

4    exhibit which way the van took you and where you saw

5    Mr. Vinton's car.

6    A    Came around this corner right here (indicating), went up

7    this street (indicating), made this turn (indicating).  I seen

8    his car right there (indicating).

9    Q    Okay.  Now, before you're seated, let me show you one

10   last picture here, Defense Exhibit No. 1.  Do you recognize

11   what's depicted in that photograph?

12   A    Yes, ma'am.

13   Q    And can you show us on Defense Exhibit No. 1 where the

14   church van went?

15   A    It came down this Minnesota Avenue right here

16   (indicating)and turned on this street right here (indicating).

17   Q    Now -- thank you.  You can go on and be seated.

18   A    (Witness sits down.)

19   Q    Now, you said that when you saw Mr. Vinton's car parked

20   there the next morning, you thought he must be playing at that

21   other church?

22   A    Yes, ma'am.

23   Q    Do you see the church you thought he would be playing at

24   in Defense Exhibit 1?

25   A    Yes, ma'am.

1    Q    Where is it?

2    A    It was that -- that church that was showed on that paper.

3    Q    Okay.  Now, you later learned, in fact, Mr. Vinton wasn't

4    playing at that church; is that correct?

5    A    Yes, ma'am.

6    Q    And you later learned he had been arrested after you had

7    seen him on September 9th?

8    A    Yes, ma'am.

9    Q    Okay.  Now, I want to show you what I've marked and

10    previously shown to the Government, but which have not yet

11    been admitted, Defense Exhibits 15 -- actually, let me start

12    with Defense Exhibits No. 8 and 9.

13            Looking at Defense Exhibit 8, do you recognize

14    what's shown in that photograph?

15            THE COURT:  Now, let's just be sure the monitor is

16    off, because these have not yet been admitted into evidence.

17    You may need your witness to come down there.

18    Q    (BY MS. LOTZE)  Okay.  Why don't you step down,

19    Mr. Long, and come around?

20            THE DEPUTY CLERK:  I can't hear you.

21            MS. MURCHISON:  Your Honor, I just wanted to

22    indicate that our monitor is not working, so I am just going

23    to look over on this side.

24    Q    (BY MS. LOTZE)  Okay.  You can come down, Mr. Long, and

25    we'll look patiently together.

 1   A    (Witness steps down.)

 2        MS. LOTZE:  Ms. Hightower has many skills.

 3   Q    (BY MS. LOTZE)  All right.  Looking at, again, Exhibit

 4   No. 8 with me, do you recognize what's shown in that

 5   photograph?

 6   A    This is my house right here (indicating).

 7   Q    Okay.  And when you say "right here," for the record,

 8   you're pointing to the red brick building that's to the far

 9   right of Defense Exhibit 8?

10   A    Yes, ma'am, with the black mark.

11   Q    Okay.  And is that a fair and accurate depiction of your

12   house as it appeared in September of 2006?

13   A    Not really, because this is -- this car right here

14   (indicating) was about right there (indicating).

15   Q    Okay.  So one of the cars in the photograph, Defense

16   Exhibit 8, was in a different location on September 9th?

17   A    Yes.  This car (indicating)was around -- more around the

18   front part of the house.

19   Q    Okay.  And when you say "this car," you're indicating the

20   car that is just above --

21        MS. LOTZE:  And, Your Honor, I guess for the jury's

22   benefit, I would move admission of Defense Exhibit No. 8 at

23   this point.

24        THE COURT:  Any objection?

25        MS. MURCHISON:  No objection, Your Honor.

1    THE COURT:  All right.  8 may be admitted.

2         (DEFENDANT'S EXHIBIT 8 ADMITTED.)

3    THE DEPUTY CLERK:  Do you want it published?

4    MS. LOTZE:  Yes, sorry.

5    Q    (BY MS. LOTZE)  All right.  So a moment ago you had

6    pointed to this car here (indicating) and said that on

7    September 9th it was in a different location?

8    A    Yeah, that car -- this car right here (indicating) was

9    about where that white -- that white sticker.

10   Q    Okay.  Now, this car here (indicating), do you recognize

11   that as Mr. Vinton's car?

12   A    Yes, ma'am.

13   Q    Okay.  And so you're saying that on September 9th,

14   Mr. Vinton's car was parked more directly in front of your

15   house?

16   A    Yes, ma'am.

17   Q    Than it is in this picture?

18   A    Yes.

19   Q    All right.  Now, I'll show you Defense Exhibit 9.

20   Actually, let me show it to you this way.  Is this also a fair

21   and accurate depiction of your house?

22   A    Yes.  This is my house here (indicating).

23   MS. LOTZE:  Okay.  I would move Defense Exhibit 9 as

24   well, Your Honor.

25   MS. MURCHISON:  No objection, Your Honor.

1        THE COURT:  That will be admitted.

2            (DEFENDANT'S EXHIBIT 9 ADMITTED.)

3        MS. LOTZE:  I am putting it up on the monitor now.

4   Q   (BY MS. LOTZE)  And if you could, point out for the jury

5   on Defense Exhibit No. 9 where is your house and studio?

6   A   This is my house (indicating).  This is my window

7   (indicating).  This is my house window right here

8   (indicating).  This is my front door (indicating).

9   Q   Okay.  And while you are here, let me show you what's

10  been marked as Exhibit 15.  Do you recognize that as a map of

11  the area surrounding your house?

12  A   Yes.

13        MS. LOTZE:  And, Your Honor, I move admission of

14  Defense Exhibit 15.

15        THE COURT:  What exhibit is this?

16        MS. LOTZE:  15.

17        MS. MURCHISON:  No objection, Your Honor.

18        THE COURT:  It will be admitted.

19            (DEFENDANT'S EXHIBIT 15 ADMITTED.)

20  Q   (BY MS. LOTZE)  So looking at Defense Exhibit 15 -- and

21  I'll zoom us in a little here.  Are you able to see on Defense

22  Exhibit 15 where your house is?

23  A   My house is right here (indicating).

24  Q   Okay.  I'm going to get you a highlighter pen.  And,

25  actually, let's start with the black pen.  Not all of the

```
1   streets on that map are labeled.  You had indicated -- I'm

2   sorry, where again is your house?

3   A    See, this is Nelson Street (indicating).

4   Q    Uh-huh.

5   A    And then my house is right here (indicating), and this is

6   Anacostia Road right here (indicating).

7   Q    Okay.  And what would this street be then that's close to

8   your house?

9   A    That's 30$^{th}$ Street.

10  Q    All right.  Let's write 30$^{th}$ here.  And if you could,

11  using this pen, just put an X where your house is.

12  A    This is my house right here (indicating).

13  Q    Okay.  All right.  Okay.  I believe you can be seated and

14  I'll ask you a couple more questions.

15  A    (Witness sis down.)

16  Q    Now, you told us a moment ago that you were seated

17  outside.  I think you said you were having a cigarette when DA

18  arrived; is that correct?

19  A    Yes, ma'am.

20  Q    And when you say you were on the steps, do you mean this

21  area here right in front of your house?

22  A    I was sitting on the front porch by that black door.

23  Q    Okay.  So right about here (indicating) where my pen is

24  pointing?

25  A    Yes, ma'am.
```

```
 1   Q   All right.  And, when DA arrived, how did he get into

 2   your studio?

 3   A   I had to let him in the front door.

 4   Q   All right.  And how long after you let DA into your

 5   studio did you see DA leave in Mr. Vinton's car?

 6   A   It was about maybe 10, 15 minutes.

 7   Q   Okay.

 8           MS. LOTZE:  I believe that's all the questions I

 9   have, Your Honor.

10           THE COURT:  Ms. Murchison, please, it's

11   cross-examination.

12           MS. MURCHISON:  Thank you, Your Honor.

13                       CROSS-EXAMINATION

14   BY MS. MURCHISON:

15   Q   Good afternoon, Mr. Long.

16   A   Hey, how are you?

17   Q   I'm fine, thank you.

18           Now, you testified that you know the Defendant,

19   Mr. Vinton, right?

20   A   Yes, ma'am.

21   Q   And you're really best friends with his uncle, yes?

22   A   Yes.

23   Q   And you associate with him through his uncle, too, right?

24   A   No, not really, not all the time.

25   Q   Have there not been times when you're around the
```

1   Defendant and you're around his uncle at the same time?

2   A    Yes, ma'am.

3   Q    And when that happens, the Defendant is on his best

4   behavior, right?

5   A    I don't know.

6           MS. LOTZE:   Objection, Your Honor, I'm not even sure

7   what --

8           THE COURT:   Sustained.

9   Q    (BY MS. MURCHISON)   Well, in your mind, the Defendant

10  wouldn't do anything to dishonor his uncle, right?

11          MS. LOTZE:   Objection, Your Honor, as to what

12  Mr. Vinton would do, how this person would know about that.

13          THE COURT:   Sustained.

14  Q    (BY MS. MURCHISON)   When Mr. Vinton is around you and

15  when he's around his uncle, that's in the church, right?

16  A    Yes.

17  Q    And, outside of the church, the only time that you spent

18  time with the Defendant is when he comes to your recording

19  studio, right?

20  A    Could you repeat that?

21  Q    Outside, when you are not in church together, the only

22  other time that you spend time with the Defendant is when he

23  comes to your recording studio, right?

24  A    Yeah, I would say that.

25  Q    And the Defendant is some years younger than you, right?

```
 1    A    Yes, ma'am.

 2    Q    And this DA who came to your recording studio that day,

 3  he's a young boy, too?

 4    A    I don't know his age.

 5    Q    Is he older than you or younger than you?

 6    A    He's younger than me.

 7    Q    And how old would you say that DA is?

 8    A    I couldn't tell you.

 9    Q    What does he look like?

10    A    He was a -- he's a black guy.  He got dreds.  He's about

11  six-foot tall.  He had tattoos.

12    Q    And your recording studio is your business, right?

13    A    Yes, ma'am.

14    Q    You run that business, right?

15    A    Yes.

16    Q    And when DA comes there to use your equipment, does he

17  pay you?

18    A    Sometimes, yes.

19    Q    Cash?  How does he pay you?

20    A    It would be cash.

21    Q    And when the Defendant comes over to use your recording

22  studio, he pays you, too?

23    A    Sometimes.

24    Q    So they're like your clients, your customers, right?

25    A    Yeah, a couple of them, yes, ma'am.
```

```
 1    Q    You make money when they come and use your equipment
 2   sometimes, right?
 3    A    Yes, sometimes.
 4    Q    Now, you talked about a white truck that came over to
 5   your recording studio back on September 9th, 2006, right?
 6    A    I said a light color -- a light-colored four-wheel-drive.
 7   That's what I said.
 8    Q    Let me show you Government's -- or Defendant's Exhibit
 9   No. 7.  Can you see that?  Is that the truck you're talking
10   about?
11    A    No, ma'am.
12    Q    Whose truck is that?
13    A    That look like -- that look like the pastor's truck.
14    Q    Okay.  And that's not the truck that came to your house
15   that night?
16    A    No, ma'am.  It was a -- it was a smaller truck.  It was,
17   like, smaller -- it was small.
18    Q    Had you seen the Defendant using that truck before they
19   came to your house that night?
20    A    I don't understand.  Say again.
21    Q    Had you seen him drive that truck that came to your house
22   that night?
23    A    The Defendant?
24    Q    Yes.
25         MS. LOTZE:  I'm not sure he knows who that is, Your
```

```
 1    Honor.

 2              THE COURT:  Mr. Vinton.  In other words, Mr. Vinton.

 3    A    No.  No, he never -- I never seen him driving his

 4    grandmother's truck.

 5    Q    (BY MS. MURCHISON)  When you saw the truck come to your

 6    house on September 9th, who was driving that truck?

 7    A    I'm not sure.

 8    Q    You hadn't seen that person before?

 9    A    No.  I don't know who was driving that truck, no, ma'am.

10    Q    But you remember around what time they came, don't you?

11    A    Not totally.

12    Q    You don't remember what time they came to your house?

13    A    No.

14    Q    And you don't remember what time the Defendant,

15    Mr. Vinton, left in that truck, do you?

16    A    I remember around what time it was.  I can't tell you

17    exactly what time it was, but I can remember it was around --

18    around what time it was.

19    Q    Now, you don't know DA's real name?

20    A    No, ma'am.

21    Q    You don't know his last name?

22    A    No, ma'am.

23    Q    But September 9th was not the first time that you had

24    seen DA, right?

25    A    No.  It's not the first time I seen him, no.
```

1    Q    Because he had come to your studio to use it before,

2    right?

3    A    Yes, ma'am.

4    Q    Now, let's get one thing straight.  When DA came to your

5    studio, he wasn't carrying any briefcase in his hand, was he?

6    A    I'm not sure about that.  I don't remember anything like

7    that.

8    Q    Well, you saw him walking down the street, right?

9    A    No, I seen him walking up the street.

10    Q    Okay.  You saw him walking up the street to your house,

11    right?

12    A    Yes, ma'am.

13    Q    And when you saw him walking up the street, you don't

14    recall him carrying any briefcase, do you?

15    A    I can't be sure about that.  I don't know.

16    Q    You don't know?

17    A    I don't know if he had -- was carrying anything or not.

18    No, I don't know.

19    Q    You don't remember him carrying any briefcase, do you?

20    A    That's what I'm saying, I don't remember him carrying

21    anything.

22    Q    And you didn't see him sneaking two cans of mace into

23    Mr. Vinton's car, did you?

24            MS. LOTZE:  Objection, Your Honor, opportunity.  She

25    would have to establish that he was able to see that.

1          THE COURT:   Objection overruled.

2    Q    (BY MS. MURCHISON)   You didn't see him sneaking two cans

3    of mace into Mr. Vinton's car, did you?

4    A    Well, I wasn't paying attention to anything like that,

5    no.

6    Q    Well, you saw him get into the car, didn't you?

7    A    Yes, ma'am.

8    Q    And you said that he was using keys to get into the car,

9    didn't you?

10   A    He used the alarm thing.

11   Q    You described the alarm, the clicker that he used to get

12   inside the car, didn't you?

13   A    Yes, ma'am.

14   Q    You saw that, right?

15   A    Yes.

16   Q    And so I'm just asking:   You didn't see him sneaking any

17   cans of mace inside the car, did you?

18   A    No.

19   Q    And you didn't see him sneaking a knife inside the car,

20   did you?

21   A    No, I didn't see him sneaking anything in the car.   I

22   seen him get in the car.

23   Q    Sorry?

24   A    I seen him get in the car.   I don't know what he had when

25   he got in the car.   But I seen him getting in the car, yes,

1    ma'am.

2    Q    But I'm asking about what you saw in his hands, and you

3    described that you saw a clicker in his hands, right?

4    A    Yes, ma'am.

5    Q    And that's the only thing you saw, right?

6    A    I don't recall seeing anything else, no, ma'am.

7    Q    You didn't see anything else, did you?

8    A    I seen he had the --

9         MS. LOTZE:   Objection, asked and answered.

10   A    He had the key, but I don't recall.  I mean, I can't

11   really recall if he had anything else.  He might have had

12   something else, I don't know.

13   Q    (BY MS. MURCHISON)  A clicker is smaller than a

14   briefcase, isn't it?

15   A    It was hooked to his key chain.  The keys was dangling

16   out the bottom of his hand, so...

17   Q    My question is:  A clicker is smaller than a briefcase,

18   isn't it?

19   A    I would say so.

20   Q    And you saw the clicker, right?

21   A    Yes, ma'am.

22   Q    But you don't remember seeing any briefcase, do you?

23   A    No.

24   Q    Okay.  Now, you said that the Defendant drove -- and when

25   I say "the Defendant," you know I'm talking about Samuel

1    Vinton, right?

2    A    At this point, yes, ma'am.

3    Q    Okay.  So when the Defendant first came to your home on

4    September 9, around what time was that?

5    A    Sometime in the midday.

6    Q    It was in the afternoon?

7    A    Yes, ma'am.

8    Q    And he came by himself?

9    A    Yes, ma'am.

10    Q    And he had that green Maxima, right?

11    A    Yes.

12    Q    The one with the tinted windows?

13    A    Yes.  It had tinted windows, yes, ma'am.

14    Q    And you didn't go inside of his car and start looking

15    around to see what was in his car, did you?

16    A    No.

17    Q    You never went inside of his car at all on

18    September 9th to look around and see what was in there, did

19    you?

20    A    No, ma'am.

21    Q    And you weren't in that car, were you?

22    A    No.

23    Q    You didn't leave anything in there?

24    A    No.

25    Q    And when the Defendant left your house in his car, what

1   time was that?

2   A    This was -- this was late in the afternoon.  It was like

3   almost dark.  It was getting pretty late.  When he left and

4   never came back, it was pretty late.

5   Q    Was it?

6   A    It was getting late in the afternoon.

7   Q    It was dark outside already?

8   A    I would say so.  It was pretty much getting dark.

9   Q    After 8:00 o'clock?

10  A    It was maybe around something like that, 8:00 o'clock

11  maybe.

12  Q    And, in order to get from your house to where the

13  Defendant's house is, you don't have to go up Massachusetts

14  Avenue, do you?  Do you know?

15  A    Massachusetts Avenue?

16  Q    Uh-huh.  Do you know where Massachusetts Avenue hits

17  Randle Circle?

18  A    Yeah, I know where that is.

19  Q    Do you have to go that way to get -- is that the shortest

20  route from your house to the Defendant's house?

21  A    I would say it's another way.  I mean, it's another way

22  to get here, yes, ma'am.

23  Q    It's not the shortest way, though, is it?

24  A    They're about the same.

25  Q    What's the other way to get there you're talking about?

1    A    You can go down -- you can go down 30th, make -- hit

2    Nelson and go up Minnesota Avenue.

3    Q    But when the Defendant left your house in the evening on

4    September 9th, he was by himself in his car, right?

5    A    I would say so.

6    Q    Was he or wasn't he?

7    A    Well, I would say so.  That's what I would -- that's what

8    I would -- you know, I would assume he was by himself.  When

9    he came -- when he knocked on my window, I went and opened the

10   door, and there wasn't nobody with him.

11   Q    Okay.  You don't know where the Defendant went after he

12   left your house, do you?

13   A    He said he was going to pick up his girlfriend.

14   Q    I'm not asking what he said.  I'm just --

15            MS. LOTZE:  Objection, Your Honor.

16            THE COURT:  Objection is overruled.

17   Q    (BY MS. MURCHISON)  I'm asking if you know where he

18   went.

19   A    No.  He said he was going to pick up his --

20   Q    Because you weren't with him, were you?

21            MS. LOTZE:  Objection, asked and answered.

22            THE COURT:  Excuse me, everyone.

23            Let me explain, sir.  You can't repeat what other

24   people have said.  We call that hearsay, and you can't do

25   that, because that person is not here to testify.  So the

```
 1    question was --

 2              Go ahead.

 3    Q    (BY MS. MURCHISON)  You weren't with the Defendant when

 4    he left your house.  You didn't leave with him, did you?

 5    A    No, ma'am.

 6    Q    And you didn't see where he was going, right?

 7    A    No, ma'am.

 8    Q    And you don't know what was in his car, do you?

 9    A    No, ma'am.

10              MS. MURCHISON:  No further questions.  Thank you.

11              THE COURT:  Ms. Lotze?

12                        REDIRECT EXAMINATION

13    BY MS. LOTZE:

14    Q    Mr. Long, you were asked some questions about whether you

15    saw Mr. DA sneak some items into Mr. Vinton's car.  Do you

16    have any idea where DA went with Mr. Vinton's car?

17    A    No, ma'am.

18    Q    Did you see whether DA let other people into the car?

19    A    No.

20    Q    Did you see whether DA went and picked up a briefcase

21    later on?

22    A    No.

23    Q    All -- and you never -- when DA returned with

24    Mr. Vinton's car, did you go out and look to see what, if

25    anything, DA may have left in there?
```

1    A    No, ma'am.

2    Q    All right.  Now, you were asked some questions about --

3    about this truck that we see in Defendant's Exhibit 7.  And

4    you indicated that this truck I'm pointing out looks like the

5    pastor's truck.

6    A    Yes, ma'am.

7    Q    Now, I see a van to the left of that white truck.  Do you

8    recognize that van?

9    A    I can't see.  You're holding the paper up.

10            MS. LOTZE:  Let me just walk --

11            MS. MURCHISON:  Objection, Your Honor.  This is

12    beyond the scope.

13            THE COURT:  Overruled.  Go ahead.

14    Q    (BY MS. LOTZE)  Let me just show it you and then I'll

15    put it back up on the screen.  Do you recognize the van to the

16    left of the photograph?

17    A    Well, that's the church van that came and picked us up.

18    Q    Okay.  All right.  So you have indicated this red van to

19    the left of Defense Exhibit No. 7 is the church van that

20    picked you up the next morning?

21    A    Yes, ma'am.

22    Q    All right.  Now, so there is no confusion, is this the

23    truck that you saw come to pick Samuel Vinton up from your

24    studio on September 9th?

25    A    No, ma'am.

1    Q    All right.  And how did you describe that truck that came

2    to pick Mr. Vinton up?

3    A    It was a light-colored -- it was a light-colored -- kind

4    of grayish, maybe grayish and light blue or something like

5    that.

6    Q    All right.

7    A    And it was a smaller -- it was a smaller four-wheel-drive

8    truck.

9    Q    All right.  Now, you were asked some questions about the

10   route between your studio and Mr. Vinton's house.  Let me zoom

11   into Defense Exhibit 15.  This mark here (indicating) is the

12   mark that you made to show where your studio is; is that

13   correct?

14   A    Yes, ma'am.

15   Q    And this street here, this large street here (indicating)

16   is Massachusetts Avenue; is that correct?

17   A    I will have to see it closer.

18   Q    Okay.  And, in fact, it may be helpful if I showed you

19   Government's Exhibit No. 1.  Let me show you these two side by

20   side.  Looking at Defense Exhibit 15, this is the street that

21   I had asked whether that's Massachusetts Avenue.

22   A    Yes, ma'am, that is.

23   Q    And you can see on the Government's larger but more

24   limited map where Massachusetts Avenue intersects Randle

25   Circle.  Do you see that?

1    A    Yes, ma'am.

2    Q    All right.  And so, just for clarity, I'll write

3    "Massachusetts Avenue" on that large street.

4          Now, you were asked about whether a person would

5    have to drive on Massachusetts Avenue to get from your studio

6    to Mr. Vinton's church.  And let me ask you whether the route

7    you were describing is shown on this map.  Is it clearly

8    possible to drive on Anacostia Avenue or Anacostia Road like

9    that to Massachusetts Avenue, out to Minnesota Avenue and on

10   out to Mr. Vinton's church?  Is that one route that you could

11   take?

12         MS. MURCHISON:  Objection, Your Honor.  This is

13   leading.  It's a mischaracterization of the testimony, and

14   it's speculative.

15         MS. LOTZE:  I think it's directly responsive to what

16   was asked in cross.

17         THE COURT:  Objection is overruled.

18   Q    (BY MS. LOTZE)  Is it possible -- is one of the routes

19   between your house and the church to go on Anacostia Road to

20   Massachusetts Avenue, around Randle Circle and out Minnesota

21   Avenue?

22   A    Well, actually, you would go down Anacostia Road, you'll

23   make a left turn on Branch.

24   Q    Uh-huh.

25   A    And go around and go to -- go like that.

 1   Q   Okay.  And you told us that another way to go would be up

 2   30th Street, which is here (indicating), to Minnesota

 3   Avenue; is that correct?

 4   A   Yes, ma'am.

 5   Q   All right.  Looking at the map, there are many different

 6   ways you can get from Point A to Point B; is that fair to say?

 7   A   Yes, ma'am.

 8   Q   All right.

 9            MS. LOTZE:  That's all the questions I have, Your

10   Honor.

11            THE COURT:  All right, sir.  Thank you.  You may

12   step down at this time.  You are free to go.

13            THE WITNESS:  Thank you.

14            THE COURT:  All right.  Counsel, do you have another

15   witness to call?

16            MS. LOTZE:  Just one more, yes.

17            THE COURT:  Please proceed.

18            MS. LOTZE:  If I could call Bruce Teixeira.

19            THE DEPUTY CLERK:  Please remain standing and raise

20   your right hand.

21            (WITNESS SWORN BY THE DEPUTY CLERK.)

22            THE DEPUTY CLERK:  You may be seated.

23

24

25

```
 1                        BRUCE TEIXEIRA,

 2   having been duly sworn, testified as follows:

 3                      DIRECT EXAMINATION

 4   BY MS. LOTZE:

 5   Q    Good afternoon, sir.  Would you please state your name

 6   and spell your last name for our court reporter?

 7   A    It's Bruce Teixeira, T-E-I-X-E-I-R-A.

 8   Q    All right.  Mr. Teixeira, we noticed that you're in

 9   uniform.  Can you tell us what you do for a living?

10   A    I'm in the United States Army.

11   Q    How long have you been in the United States Army?

12   A    Total, 14 years.

13   Q    What's your current rank?

14   A    I'm a specialist.

15   Q    All right.  And if you need to, feel free to pull that --

16   A    Put the mic close?

17   Q    Yes.  What do you do as a specialist in the Army?

18   A    I currently work as a military counter-intelligence over

19   in Fort Meade.

20   Q    All right.  How long have you been stationed at Fort

21   Meade?

22   A    I just arrived in Fort Meade approximately two months

23   ago.

24   Q    And before that where were you stationed?

25   A    Stationed -- training -- basic training in Fort Benning,
```

```
 1  Georgia, training new troops coming into the Service.

 2  Q   All right.  In what area did you grow up?

 3  A   I grew up in Southeast Washington, D.C.

 4  Q   All right.  And where do you live now?

 5  A   I currently live in Temple Hills.

 6  Q   With who?

 7  A   With my wife and children.

 8  Q   All right.  Do you know a person by the name of Samuel

 9  Vinton?

10  A   Yes, I do.

11  Q   How is it that you know Mr. Vinton?

12  A   He was an associate in music.  Music is pretty much one

13  of my -- I don't want to say hobby, but one of my, you know,

14  gifts, I guess.

15  Q   All right.  You haven't been able to quit your day job

16  yet, though?

17  A   No, not yet.  Not yet.

18  Q   What kind of music is it that you are interested in?

19  A   Music, period.

20  Q   All right.  And how did your interest in music connect

21  you to Mr. Vinton?

22  A   Well, I was working with a group in the studio, basically

23  as a producer and managing a group.  And I heard -- naturally,

24  as a musician.  And I heard of a -- I heard of a band that was

25  looking for a percussionist.  And at the time, dealing with
```

1    the music, I did have a desire to actually want to go back and

2    perform, so I took advantage of the opportunity.  I was

3    introduced to him, filled the slot of the percussionist that

4    they needed for the group, and that's pretty much how the

5    relationship began.

6    Q    And how many years ago was that?

7    A    I would have to say about five or six years ago.

8    Q    So you played in the same band for a little while; is

9    that accurate?

10   A    Exactly.  Exactly.

11   Q    And for how many years did that go on?

12   A    I would say for about three years I actually performed

13   with that band.

14   Q    Okay.  Now, I want to direct your attention to

15   September 9th of '06, the following -- last year.

16   A    Right.

17   Q    Did you -- at that time, where were you stationed?

18   A    I was stationed in Ford Benning, Georgia.

19   Q    All right.  But did you -- were you in town the weekend

20   that Mr. Vinton got arrested?

21   A    Correct.  I arrived in town, I would say, somewhere

22   between 10:00 and 11:00 o'clock that evening on Friday.

23   Q    Okay.  And on the next day, Saturday, September 9th,

24   did you have plans to meet up with Mr. Vinton?

25   A    I did.

1    Q    And what was -- where were you-all going to meet up?

2    A    Well, I had a CD of his that they heard down in Georgia.

3    People were interested.  And so when I came home, I actually

4    couldn't get with them, you know.  And I grabbed something to

5    eat so I could talk to them.  I was hoping he would get on

6    a -- you know, on a business plan with me to go down here and

7    get some music going down in Atlanta.

8    Q    Okay.  And so you were -- you were planning to go get

9    something to eat?

10   A    Exactly.

11   Q    For breakfast, lunch, dinner?

12   A    This was early evening.  I wouldn't quite call it dinner,

13   but just grab a bite to eat early evening.

14   Q    And on what day were you planning to have dinner with

15   Mr. Vinton?

16   A    This was Saturday.

17   Q    Okay.  Were you able to meet up with Mr. Vinton that day?

18   A    I was.

19   Q    Where?

20   A    I picked him up from the studio that he was at.

21   Q    Now, do you know, are you familiar with that studio?

22   A    I recorded two songs myself out of that studio prior to

23   leaving to go to Fort Benning.

24   Q    Okay.  Where is the studio, if you know?

25   A    In Southeast Washington, D.C.

```
 1    Q   All right.  Are you familiar with the gentlemen who
 2   operates and owns that studio?
 3    A   I am familiar with him, yes.
 4    Q   All right.  And have you seen him down here for court, as
 5   well?
 6    A   Oh, yeah.  Yeah, I have seen him.
 7    Q   All right.  Now, so you said -- I'm sorry I interrupted
 8   you.  You had to pick up Mr. Vinton from the studio?
 9    A   Yeah.  That wasn't the original plan.  Then I did end up
10   picking up Mr. Vinton from the studio.
11    Q   What was the original plan?
12    A   He was going to meet me because, I mean, that was the
13   only thing I had to do that day.  I mean, I kind of -- I had a
14   lot of plans crunched into that one day, and I pretty much was
15   on -- I had a curfew at 9:00 o'clock that evening with my
16   wife.
17    Q   Who gave you that 9:00 o'clock curfew?
18    A   My wife.
19    Q   All right.  And so what was the -- what time were you
20   planning to meet with Mr. Vinton?
21    A   Well, we were going to meet somewhere between 5:00 and
22   6:00 o'clock at Friday's in Greenbelt.  And as I was in route
23   to let him know I was on my way -- sometimes you have to
24   remind him, because he's -- you know, he's always busy.  So I
25   wanted to make sure he was going to meet me.  And he told me
```

1    he had a problem, he didn't have his vehicle so would it be a

2    problem if I came and got him.

3    Q    Okay.

4    A    So that's how I ended up picking him up.

5    Q    All right.  So do you recall what time that was that you

6    were on your way and learned that you needed to pick him up?

7    A    Not exactly.  I can say it was definitely between

8    5:30 and 6:00 o'clock, though.

9    Q    All right.  And were you able to pick Mr. Vinton up from

10   the studio?

11   A    Yes, I did.

12   Q    And do you recall about what time that was?

13   A    Between 5:30, 6:00 o'clock.

14   Q    All right.  And then what happened after that, when you

15   picked Mr. Vinton up?

16   A    We rode -- I started explaining to him, you know, that I

17   got a good response by one of the CDs I had in my vehicle.

18   Somebody had heard it and asked me who was that, you know.

19            I let them know about Mr. Vinton.

20            And he asked me, "Well, would you-all be interested

21   in recording, you know, with us?"

22            And that went on for a little bit, and I finally got

23   a chance to come home and actually talk to him one on one.

24            So, basically, the whole meeting was around the

25   hopes of trying to get him to relocate to Atlanta.  I was

1    willing to put him up in my home, you know, so he wouldn't

2    have to worry about the expenses and things of that nature.

3    And I asked him, "Give me three months, and nothing

4    happens" -- if he doesn't feel like playing, then go on back

5    home.

6    Q    All right.  Now, let me ask you:  What were you driving

7    when you arrived to pick Mr. Vinton up from the studio?

8    A    I was driving my wife's vehicle.  It's a Ford Escape --

9    2005 Ford Escape.  It's like a -- I guess like almost the

10   color of this table here.

11   Q    A light gray, you said?

12   A    Right.

13   Q    Okay.  And when you got to the studio to pick Mr. Vinton

14   up, and you were driving that light-colored truck, what -- how

15   did you get his attention?

16   A    When I picked him up?

17   Q    Yes.

18   A    I pulled to the corner, beeped the horn.

19   Q    All right.  And what happened after you pulled up to the

20   corner and beeped the horn?

21   A    He came up a couple of minutes later.

22   Q    All right.  Now, I want to show you what's been admitted

23   as Defense Exhibit Nos. 8 and 9.  I'm showing you first No. 8.

24   I'll first ask you whether you're able to see up on the screen

25   on the bench Defense No. 8.

1    A    I knew I should have put on my glasses.

2          THE COURT:  Do you want him to step down?

3    Q    (BY MS. LOTZE)  If you need to step down, I'll be happy

4    to have you come down here.

5    A    I can make it out.

6    Q    Why don't you step down so you can --

7    A    It's a corner.  I can step down there?

8    Q    Yes, please.

9    A    All right.  Okay.  That's better.

10   Q    And, actually, if you come on over here, I can point to

11   the exhibit and the jury can see what you're pointing to.

12          Do you see where, on Defendant's Exhibit 6, you

13   pulled up in your light-colored truck?

14   A    Right by exactly where this fire hydrant is located.

15   Q    Where was it you beeped your horn?

16   A    Right there on that corner.

17   Q    Okay.  Now, you said you made a u-turn.  Had you come in

18   the opposite direction?

19   A    Yes.  I came up from this angle right here (indicating).

20   Q    Uh-huh.

21   A    Which would take me down to Minnesota Avenue.  And I came

22   up and parked here (indicating), beeped my horn and made a

23   u-turn, and went back around this way (indicating).

24   Q    All right.  Now, when you came to pick Mr. Vinton up, did

25   you see -- well, first let me ask you:  Are you familiar with

1    Mr. Vinton's car?

2    A    Yes, I am.

3    Q    I guess you could go back.

4    A    It's right there (indicating) in the picture.

5    Q    Okay.  And you pointed out Mr. Vinton's car is right here

6    (indicating), in this Defendant's Exhibit 8?

7    A    Correct.

8    Q    Now, when you came to pick Mr. Vinton up, did you see

9    that car?

10   A    I didn't see it.

11   Q    All right.  And when -- what happened after you-all had

12   your meeting over there?  Did you give him a ride anywhere?

13   A    No.  He came right back up to the studio.  I dropped him

14   back off at the studio.

15   Q    You said you dropped him back off at the studio?

16   A    Correct.

17   Q    All right.  And do you recall seeing Mr. Vinton's car at

18   that time?

19   A    Right as I pulled up alongside his vehicle, when we came

20   in, I pulled in and made the same u-turn, but pulled up

21   alongside the vehicle.  And pretty much the vehicle was parked

22   pretty much in the same spot that you see on that picture

23   right there (indicating).

24   Q    All right.  Right out in front of the studio?

25   A    Correct.

1    Q    And when you pulled alongside Mr. Vinton's car, in front

2    of the studio when you dropped him off, you saw, certainly,

3    where his car was at that point; is that correct?

4    A    Well, yeah.  I mean, not only that, but he made the

5    comment, because I guess he had been waiting on his vehicle.

6    So he made that comment, so that's why I pulled off -- dropped

7    him off right there, as well.

8    Q    Okay.  All right.  So after Mr. Vinton made a comment,

9    you dropped him off, and what did you do?

10    A    I left.

11    Q    Now, you told us you had a wife-imposed curfew of

12    9:00 p.m.

13    A    Yeah, I did.

14    Q    Do you recall what time it was that you dropped

15    Mr. Vinton off?

16    A    I know I was pushing it close, so I know it was close.  I

17    probably had 15 minutes to get home.

18    Q    All right.  And that's the point in time when you dropped

19    Mr. Vinton off back at the studio?

20    A    Exactly.

21    Q    All right.

22            MS. LOTZE:  That's all the questions I have, Your

23    Honor.

24            THE COURT:  Ms. Murchison, please.

25

```
 1                          CROSS-EXAMINATION

 2   BY MS. MURCHISON

 3   Q   Good afternoon, sir.

 4   A   Hello.

 5   Q   Do you know DA?

 6   A   Say again?

 7   Q   Do you know someone named DA?

 8   A   Yeah, I am familiar with DA.  DA was a member of the same

 9   band I was playing in.  He was actually lead rapper for the

10   band.

11   Q   Do you know his full name?

12   A   That, I don't know.  I don't know DA's full name.

13   Q   About how old is he?

14   A   The majority of the guys -- I was pretty much the oldest

15   member in the band.  Most of the guys in the band were

16   somewhere around the age of -- at that particular time, I

17   would say the early 20s.  No one was probably over 23.

18   Q   And --

19   A   So I would have to say that being -- I would say he's

20   probably in his late 20s now.

21   Q   Did you see DA on September 9$^{th}$, 2006?

22   A   No, I didn't.

23           MS. MURCHISON:  I have no further questions.

24           MS. LOTZE:  Just briefly.

25           MS. MURCHISON:  Your Honor, I object to -- I
```

```
 1    withdraw.
 2                        REDIRECT EXAMINATION
 3    BY MS. LOTZE:
 4    Q    Did you see who had Mr. Vinton's car when it wasn't
 5    parked in front of the studio?
 6    A    No, I didn't.
 7    Q    All right.
 8              MS. LOTZE:  That's all the questions I have.
 9              THE COURT:  All right.  Thank you, sir.  You may
10    step down.
11              THE WITNESS:  Thank you.
12              THE COURT:  And would counsel approach, please?
13              Stand up and take a stretch, everybody.  You are
14    welcome to.
15              (AT THE BENCH; ON THE RECORD.)
16              THE COURT:  That's going to close your testimony?
17              MS. LOTZE:  I just want to, at some point, review,
18    to make sure I had moved in all my exhibits, but that's all I
19    have.
20              THE COURT:  Did you give me a list of exhibits?  I
21    don't think that you gave them to us.
22              MS. LOTZE:  I did, Your Honor.
23              THE COURT:  All right.  Well, we'll put that aside
24    for a minute.
25              MS. LOTZE:  All right.
```

1          THE COURT:  Are you going to have any rebuttal

2  testimony?

3          MS. MURCHISON:  No, Your Honor.

4          THE COURT:  Okay.  Well, I can never see the clock.

5          MS. LOTZE:  It's 3:00.

6          THE COURT:  It's when it's on the 12 that you can't

7  see it.  Any other time I can.  Okay.  3:00.  Gee, you each

8  are going to need about a half an hour; certainly takes a half

9  an hour for instructions.  Well, we could get it done today by

10  pushing it.

11          You've both had a chance to look at the instructions

12  now.  You didn't have a lot of chance, but a little.  Did

13  either one of you see anything that was a problem?

14          MS. MURCHISON:  I didn't, Your Honor.  I only had an

15  opportunity to do a cursory review.  But at this point,

16  honestly, I would like to be able to look at it a little bit

17  more if I'm able to, but I didn't see anything.

18          THE COURT:  You didn't give me instructions on

19  the --

20          MS. LOTZE:  I have one ready, now that the evidence

21  is in.

22          THE COURT:  Would you bring it up, please.

23          MS. LOTZE:  You know, I meant to make copies, Your

24  Honor.  I'm sorry.

25          MS. MURCHISON:  I object to that, Your Honor.  There

1    is absolutely no evidence that DA ever brought anything inside

2    of the car, much less a briefcase.

3             MS. LOTZE:  That's our theory.

4             MS. MURCHISON:  Or that the Defendant was shocked

5    when he learned that there was a briefcase in his car or

6    anything to support that on the record.  There is no evidence.

7             THE COURT:  Let me just read it all.  I'm on the

8    last part.

9             (PAUSE.)

10            THE COURT:  What was the second thing you said?

11   Maybe I misunderstood you.

12            MS. MURCHISON:  I was saying that there is no

13   testimony on this record that Mr. Vinton was -- that

14   unbeknownst to him that he was surprised when he was asked

15   about the briefcase or when somebody else -- when Officer

16   Alton mentioned the briefcase.  This allows the Defendant

17   to --

18            THE COURT:  Where do you get surprise in here?

19            MS. MURCHISON:  Well, unbeknownst to him, like he

20   was surprised and didn't know.

21            THE COURT:  That's not what "unbeknownst" means.  It

22   means just what it says; he didn't know.

23            MS. MURCHISON:  But I'm saying there is nothing to

24   support that he didn't know that on this record.  And that

25   that would be allowing for his -- that's, in essence, the

 1    Defendant testifying to what he thought and what he didn't

 2    think, what he knew and what he didn't know.  And that's why

 3    I'm objecting to it.  There is nothing to support that on the

 4    record.

 5         MS. LOTZE:  Your Honor --

 6         MS. MURCHISON:  There is something to support that

 7    other people drive his car.  That's it.  But that doesn't

 8    answer -- that's not a defense to whether somebody else put

 9    these items in his car.  The fact that somebody else used the

10    car -- that somebody else used the car and that some other

11    person -- DA never had a briefcase or never put a briefcase in

12    there.  That's the facts on these records -- on the record.

13         THE COURT:  What's your position?

14         MS. LOTZE:  Your Honor, this isn't substituting for

15    Mr. Vinton's testimony.  I mean, this -- a reasonable

16    inference can be made from the evidence that was presented

17    when DA had the car.  When he had the car without Mr. Vinton,

18    it's our theory that DA put the briefcase in the car

19    unbeknownst to Mr. Vinton.  That's certainly a reasonable

20    inference from the evidence that was presented.

21         THE COURT:  We don't need that word "unbeknownst"

22    beside -- it's not a very good word for the jury, anyway.

23         MS. LOTZE:  No, Your Honor.

24         THE COURT:  And there is certainly no evidence to

25    support that.  The rest is the Defendant's theory, and that's

what that instruction means, is that the Defendant gets a

chance to restate his theory.

MS. MURCHISON:  I just do want to note that I did

attempt to deal with this issue in filing my motion in limine

to prevent -- to preclude this third-party defense.  And I

don't believe that the requisite nexus has been established in

order to make this.  This is a perfectly good argument when

you establish that somebody else had items -- or when you have

the evidence on the record to support it, and there is not.

THE COURT:  She has on the record that DA drove away

in his car and borrowed his car.

MS. MURCHISON:  That's not a defense to items that

are left in the car.  That just means that other people used

his car.

THE COURT:  That is not correct.  I'll redo this

when it goes to the jury.  But I will give the Defense theory

of the case without that word "unbeknownst."  I'm going to let

this jury take a recess.  Let's go over the Defense exhibits

quickly, and then we'll finish this afternoon.

(OPEN COURT.)

THE COURT:  I'm about to give everyone a recess.

All right.  The jury can take 10 minutes now.  I think Juror

No. 2 needs to speak with me about something, and you may come

forward, sir, with counsel on the record, of course, while the

jury is going out.  Counsel, please.

```
 1                    (JUROR NO. 2 AT THE BENCH; ON THE RECORD.)

 2              THE COURT:  All right.  Juror No. 2.

 3              JUROR NO. 2:  Yes.  I wanted to speak with you about

 4    something.  I do apologize for -- I had an emergency, but what

 5    I wanted to speak to you about was I am kind of familiar with

 6    the DA.

 7              THE COURT:  You know DA?

 8              JUROR NO. 2:  When they said the description, it fit

 9    the person that I know.  And not personally.  I worked with

10    him -- I worked with him over the years.

11              THE COURT:  I see.  Well, I am certainly glad you

12    let me know.  That probably never happens, but that's why I

13    give that instruction.

14              JUROR NO. 2:  Uh-huh.

15              THE COURT:  So let me see if counsel have any

16    questions at all.  Did you hear, Ms. Murchison?

17              MS. MURCHISON:  I think he said that he's familiar

18    with DA.

19              THE COURT:  And that he's worked with him.  Am I

20    right?  And would I be correct that it was in the music field

21    or some other field?

22              JUROR NO. 2:  No, no.  Actually, retail.

23              THE COURT:  Retail?

24              JUROR NO. 2:  Uh-huh.  I'm not sure what --

25              THE COURT:  Ms. Murchison, you better listen.  They
```

 1  worked together in the retail field, not music field.  Do you

 2  have any questions?  That's my question now.

 3          MS. MURCHISON:  No more questions.  The question I

 4  don't think I can ask --

 5          THE COURT:  Then don't.

 6          MS. LOTZE:  Would your knowledge of DA prevent you

 7  from reaching a verdict in the case?  Do you feel that your

 8  knowledge of him would make you be unfair to either side?

 9          JUROR NO. 2:  No.

10          MS. MURCHISON:  If there is a suggestion that DA is

11  the person who put the briefcase and the items inside of the

12  car, what about your experience with him?  How would you

13  evaluate that information, based on your experience with him?

14          JUROR NO. 2:  I've only really known him on the

15  retail side of the fence.

16          THE COURT:  Let me ask you how well you really know

17  him.  Have you worked in the same store with him?

18          JUROR NO. 2:  Uh-huh.

19          THE COURT:  Over what period of time, roughly?

20          JUROR NO. 2:  Three years.

21          THE COURT:  Three years?

22          JUROR NO. 2:  Uh-huh.

23          THE COURT:  Have you worked on a daily basis with

24  him?

25          JUROR NO. 2:  Uh-huh.

1          MS. LOTZE:  Do you work together now?

2          JUROR NO. 2:  Yeah.

3          THE COURT:  All right.  Just have a seat in the jury

4     box for a minute.

5          JUROR NO. 2:  Okay.

6          THE COURT:  And thank you very, very much.  You

7     followed the instructions exactly.

8          JUROR NO. 2:  Uh-huh.

9          THE COURT:  Just have a seat.

10         (JUROR NO. 2 NOT AT THE BENCH; ON THE RECORD.)

11         THE COURT:  I am about to excuse him.  And I'm not

12    saying for one minute I thought he had bias on either side.  I

13    haven't the faintest idea.  But he works with the gentleman,

14    and depending on the verdict, I think that is testing him on

15    that person's involvement, and he worked with him for three

16    years.

17         MS. MURCHISON:  I think that's right, Your Honor, we

18    would be --

19         THE COURT:  If you want to state an objection for

20    the record you may, Ms. Lotze.  But I don't mean in any way to

21    be critical of him, because he's done exactly the right thing.

22    He can't but feel uncomfortable.

23         MS. LOTZE:  I would object for the record.

24         THE COURT:  Okay.

25         (OPEN COURT.)

1          THE COURT:  Juror No. 2, I want to thank you again

2   for telling us.  You did the exact right thing, and I do have

3   to excuse you.  You know this person.  We can't ever take a

4   chance in a criminal trial that anybody's personal knowledge

5   could affect their evaluation of evidence, and I think you

6   know that.

7          Do you have things in the jury room?

8          JUROR NO. 2:  No.

9          THE COURT:  You don't?  Good.  I would -- I want to

10  instruct you -- first of all, I will let you go out the front

11  way.  And I want to instruct you to not reveal to any member

12  of the jury the information that you've told us at the bench,

13  because I just wouldn't want them to hear anything like that.

14  Because then they might ask you questions, which would

15  obviously be very wrong.

16         So thank you very much.  Good luck at school this

17  year, and I hope you'll be a famous graphic artist some day --

18  not famous, successful and productive.  I shouldn't say

19  famous.  Thank you.  I think you have to return to the jury

20  lounge, don't you?

21         THE DEPUTY CLERK:  Yes, ma'am.

22         THE COURT:  You do have to check in at the jury

23  lounge.  I'm sure at this hour they'll let you go for the day.

24         JUROR NO. 2:  All right.

25         THE COURT:  All right.  Thank you.

```
 1                    (JUROR NO. 2 LEAVES.)

 2             THE COURT:  All right.  We are going to take a

 3  10-minute recess -- 10 minutes at the most, because we still

 4  have a lot to do this afternoon.

 5             THE DEPUTY CLERK:  All rise.  This honorable court

 6  will stand in brief recess.

 7                    (A BRIEF RECESS WAS TAKEN.)

 8                    (JURY PRESENT.)

 9             THE COURT:  Please be seated, everyone.

10             Counsel, I just realized there was one matter we

11  didn't take care of regarding exhibits.  I need to just talk

12  with counsel for a minute or two.  That's all.

13                    (AT THE BENCH; ON THE RECORD.)

14             THE COURT:  Ms. Lotze, what are you needing to do?

15  I don't think that the objections were to pictures.

16             MS. MURCHISON:  No, there were no objections.

17             THE COURT:  All right.  Would you give the numbers,

18  please?

19             MS. LOTZE:  1 through 9.

20             THE COURT:  1 through 9 are all admitted with no

21  objections.  Admitted.  Okay.

22             MS. LOTZE:  No. 15.

23             MS. MURCHISON:  All right.

24             MS. LOTZE:  Your Honor --

25             THE COURT:  She didn't get any on that.
```

1              MS. LOTZE:  Officer --

2              THE COURT:  That's what we did.

3              MS. LOTZE:  Your Honor, Officer Alton testified and

4    was asked by both sides some questions about needing to arrest

5    Mr. Vinton.

6              MS. MURCHISON:  I'm not going to object to those.

7    Your Honor, I think we need to just inquire if the Defendant

8    wants to testify at this point on the record; do we do that

9    now?

10             THE COURT:  Well, I wish we had done it before.

11             MS. MURCHISON:  I didn't think.

12             MS. LOTZE:  I haven't discussed it with him, and he

13   does not want to testify.  He is prepared to answer the first

14   questions if the Court wanted to address him directly.

15             MS. MURCHISON:  I really think we need to get it on

16   the record.

17             THE COURT:  You don't want do that in front of a

18   jury, though.

19             MS. MURCHISON:  No.  I don't think it will take

20   long.

21             MS. LOTZE:  Your Honor, we could do it afterward.  I

22   mean, he's happy to tell you then, just as happy he can tell

23   you now, that he waives his right to -- waive his right to

24   testify.

25             THE COURT:  We will do it afterwards.

1          (OPEN COURT.)

2          THE COURT:  Does the Defense rest at this time?

3          MS. LOTZE:  Yes, Your Honor.

4          THE COURT:  And is there any rebuttal evidence from

5   the Government?

6          MS. MURCHISON:  No, Your Honor.  Thank you.

7          THE COURT:  All right.  Ladies and gentlemen, I told

8   you we were right on track, because I had a pretty good idea

9   of how we were doing it, because I'm always asking the lawyers

10  how much more do they have.  And of course, you know,

11  sometimes circumstances change.

12          I am now going to give you your final instructions

13  of law in this case.  And as I told you, I believe Monday

14  afternoon, when I finish, there will be closing arguments from

15  counsel, and then there will be some very brief instructions

16  from me as to how you should conduct yourself in the jury room

17  and how you should get organized and that kind of thing.  And

18  then actually, given the hour, I strongly suspect that at that

19  point it will be time for me to go home.

20          I think it will be just about 5:00 o'clock, if I

21  calculated everything correctly, and then you'll come back

22  first thing tomorrow morning.  Not 10:00 o'clock,

23  9:00 o'clock, everybody, and then you will start in

24  deliberations.  And, of course, you can take as long as you

25  need.

1          I am going to provide you -- this is the first thing
2   I want to tell you.  I am going to provide you with a copy of
3   my instructions, a written copy.  During your deliberations
4   you may, if you want, refer to the written instructions.
5   While you may refer to any particular portion of the
6   instructions, you are to consider the instructions as a whole,
7   and you may not follow some and ignore others.  The fact that
8   you have been provided a copy of my instructions should not
9   discourage you from making any inquiry regarding the meaning
10  of the instructions if you find that to be necessary.  And
11  then please return the instructions to me when your verdict is
12  rendered.

13         I tell you all of that up front so that you can
14  simply focus on the oral instructions now and listen
15  carefully.  You don't have to worry about taking notes,
16  although you are certainly welcome to if you want to.  And you
17  certainly don't have to worry about remembering every word of
18  the instructions, because you will get a written copy of them.

19         My function, ladies and gentlemen, is to conduct the
20  trial in an orderly, fair, and in an efficient manner, to rule
21  on questions of law, and to instruct you on the law which
22  applies to this case.

23         It is your duty to accept the law as I state it to
24  you.  You should consider all of the instructions as a whole.
25  You may not ignore any instruction or question the wisdom of

1    any rule of law.

2            Now, your function as the jury is to determine what

3    the facts are in this case, and you are the sole judges of the

4    facts.  You alone decide what weight to give to the evidence

5    presented during the trial.  You decide the value of the

6    evidence and the believability of the witnesses.

7            You should determine the facts without prejudice,

8    fear, sympathy, or favoritism.  You shouldn't be improperly

9    influenced by anyone's race or ethnic origin or gender or

10   sexual preference.  Decide the case solely from a fair

11   consideration of the evidence.

12           You may not take anything that I might have said or

13   done as indicating how I think you should decide this case.

14   If you believe that I expressed or indicated any opinion on

15   the facts, you should ignore it.  And that's because it is

16   your sole and exclusive duty to decide the verdict in this

17   case.

18           If any reference by myself or by counsel to the

19   evidence doesn't coincide with your recollection of the

20   evidence, it is your recollection which should control during

21   your deliberations.

22           Every defendant in a criminal case is presumed to be

23   innocent.  The presumption of innocence remains with the

24   defendant throughout the trial unless and until he is proven

25   guilty beyond a reasonable doubt.

1          The burden is on the Government to prove the
2    Defendant guilty beyond a reasonable doubt.  The burden of
3    proof never shifts throughout the trial.  The law does not
4    require a Defendant to prove his innocence or to produce any
5    evidence.  If you find that the Government has proven beyond a
6    reasonable doubt every element of the offense to which the
7    Defendant is charged, then it is your duty to find him guilty.
8    On the other hand, if you find that the Government has failed
9    to prove any element of the offense beyond a reasonable doubt,
10   you must find the Defendant not guilty.

11          Reasonable doubt, as the name implies, is a doubt
12   based on reason, a doubt for which you can give a reason.  It
13   is such a doubt as would cause a juror, after careful and
14   candid and impartial consideration of all the evidence, to be
15   so undecided that you cannot say that you have an abiding
16   conviction of the Defendant's guilt.  It's such a doubt as
17   would cause a reasonable person to hesitate or to pause in the
18   graver or more important transactions of life.  But it's not a
19   fanciful doubt, it's not a whimsical doubt, it's not a doubt
20   based on conjecture.  It is a doubt which is based on reason.

21          The Government is not required to establish guilt
22   beyond all doubt or to a mathematical certainty or to a
23   scientific certainty.  Its burden is to establish guilt beyond
24   a reasonable doubt.

25          During your deliberations, you may consider only the

evidence which has been properly admitted in the trial.   In

this case, that was the sworn testimony of the witnesses, the

exhibits which were admitted into evidence, and the facts

stipulated to by the parties -- and you will remember there

was a stipulation.

A stipulated fact, as I told you, is undisputed

evidence, and you may consider it as undisputed evidence.

When you consider the evidence, you are permitted to

draw from the facts which you find have been proven such

reasonable inferences as you feel are justified in the light

of your experience.

There are two kinds of evidence from which you may

find the truth as to the facts of the case.   They're called

direct evidence and circumstantial evidence.   When a witness

asserts actual knowledge of a fact, such as an eyewitness,

that witness' testimony is called direct evidence.   "I saw

something."   That's direct evidence.

A chain of facts and circumstances indicating the

innocence or the guilt of the Defendant is called

circumstantial evidence.   The law doesn't make any distinction

between the weight you should give to either kind of evidence,

nor does circumstantial evidence require a greater degree of

certainty than direct evidence.

In reaching a verdict in this case, you should weigh

all of the evidence presented, both direct and circumstantial.

1    The indictment is merely a formal way of accusing a

2  person of a crime in order to bring that person to trial.  You

3  must not consider the indictment as evidence of any kind.  You

4  may not consider it as any evidence of the Defendant's guilt

5  or draw any inference of guilt from it.

6    The lawyers in the case sometimes objected, as you

7  well know, when the other side asked a question or made an

8  argument or offered evidence which the objecting lawyer

9  believed was not proper.  You must not be prejudiced against

10  any lawyer who makes objections.  It is the lawyer's

11  responsibility to object to evidence which they believe is not

12  admissible.

13    Now, if -- during the course of the trial, if I

14  sustain or approve an objection to a lawyer's question, then

15  you should disregard the question and you mustn't speculate as

16  to what the answer would have been.

17    The opening statements and the closing arguments

18  you're about to hear by counsel are not evidence.  They are

19  only intended to assist you in understanding the evidence.

20    Now, sometimes a lawyer's question suggests that

21  something is a fact.  You may consider the witness' answer,

22  not the lawyer's question.  A lawyer's question is not

23  evidence.  A witness' answer is evidence.

24    I want to talk with you about the credibility of

25  witnesses.  In determining whether the Government has

1    established the charges against the Defendant beyond a

2    reasonable doubt, you must consider and weigh the testimony of

3    all the witnesses who have appeared before you.

4    　　　　You are the sole judge of their credibility.  In

5    other words, you alone determine whether to believe any

6    witness and the extent to which any witness should be

7    believed.

8    　　　　In reaching a conclusion on the credibility of a

9    witness, you may consider any matter that may have a bearing

10   on that subject, but I'll give you some examples of the kinds

11   of things that you can take into account.

12   　　　　You may consider the demeanor and the behavior of

13   the witness on the witness stand.  You may consider the

14   witness' manner of testifying; whether the witness impresses

15   you as a truthful person; whether the witness impresses you as

16   having an accurate memory and recollection; whether the

17   witness has any motive for not telling the truth; whether the

18   witness had a full opportunity to observe the matters about

19   which they testified; whether the witness has a interest in

20   the outcome of the case or friendship or hostility toward

21   other people concerning the case.

22   　　　　Inconsistencies or discrepancies in the testimony of

23   a witness or between the testimony of different witnesses may

24   or may not cause you to discredit the testimony.  Two or more

25   people who witness an incident or a transaction may see it or

1  hear it differently.  An innocent misrecollection, like a

2  failure to remember, is not at all uncommon.

3      In weighing the effect of any inconsistency or

4  discrepancy in testimony, always consider whether it relates

5  to a matter of an important or unimportant detail and whether

6  the inconsistency or the discrepancy results from innocent

7  error or intentional falsehood.

8      You may consider the reasonableness or

9  unreasonableness, the probability or improbability of the

10 testimony of a witness, in deciding whether to accept it as

11 true and accurate.  You may consider whether the witness has

12 been contradicted or corroborated or supported by other

13 credible evidence.

14     If you believe that any witness has shown themselves

15 to be biased or prejudiced for or against either side in the

16 trial, then you may consider and determine whether such bias

17 or prejudice has colored the testimony of that witness so as

18 to affect the desire and capability of that witness to tell

19 you the truth.  You should give the testimony of each witness

20 such weight as in your good judgment it is fairly entitled to

21 receive.

22     Ordinarily, the rules of evidence don't permit

23 witnesses to testify as to their opinions or their

24 conclusions, but we do make an exception to this rule for what

25 we call expert witnesses.  Experts are allowed to give their

opinions or conclusions because they become expert in some art

or science or profession.  They may give their opinions or

conclusions and the reasons for their opinions.

In this case, I permitted at least two people to

testify as experts.  You are not bound by an expert's opinion.

If you find that the opinion is not based on sufficient

education or experience, or that the reasons supporting the

opinion are not sound, or that the opinion is outweighed by

other evidence, you may completely or partially disregard the

expert opinion.

In other words, give the expert opinion the weight

you think it deserves after you consider it along with all the

other evidence.

You have heard evidence that a witness made a

statement on an earlier occasion and that this statement may

be inconsistent with the testimony that the witness gave in

this trial.  The earlier statement was brought to your

attention to help you evaluate the witness' believability here

in court.  In other words, if on an earlier occasion the

witness made a statement that is inconsistent with the

testimony that they gave in court in this trial, then you may

consider that inconsistency in judging the credibility of the

witness.  You may not consider that earlier statement as proof

that what was said in the earlier statement was true.

It is for you to decide whether a witness made a

statement on an earlier occasion and whether the earlier

statement was inconsistent with the testimony the witness gave

in this trial.

The testimony of a law enforcement officer should be

considered by you just as any other evidence in the case.  In

evaluating an officer's credibility, you should use the same

guidelines which you apply to the testimony of any witness.

And I just gave you some of those guidelines.  In no event

should you give either greater or lesser weight to the

testimony of a witness simply because they are a law

enforcement officer.

Every Defendant in a criminal case has an absolute

right not to testify.  In this case Mr. Vinton has chosen to

exercise his right to remain silent.  You must not hold this

decision against him, and it would be improper for you to

speculate as to the reason or reasons for his decision.  And,

therefore, I specifically instruct you not to do so.  Most

importantly, everyone, you mustn't draw any inference of guilt

from the Defendant's decision not to testify.

The burden is on the Government to prove beyond a

reasonable doubt not only that the offense was committed as

alleged in the indictment, but also that the Defendant was the

person who committed it.

In considering whether the Government has proved

beyond a reasonable doubt that the Defendant is the person who

1    committed the offenses charged, you may consider any one or

2    more of the following.

3          You may consider the witness' opportunity to observe

4    any criminal acts and the person committing them, including

5    the length of the encounter, the distance between the various

6    parties, lighting conditions at that time, the witness' state

7    of mind at the time of the offense, and any other

8    circumstances that you think are relevant affecting the

9    witness' opportunity to observe the person allegedly

10   committing the offenses.

11         You may consider any subsequent identification or

12   failure to identify or misidentification by the witnesses, the

13   certainty or lack of certainty expressed by the witnesses, the

14   state of mind of the witnesses at the time, the length of time

15   that elapsed between the crime and any subsequent

16   identification and any other circumstances that you think are

17   relevant which relate to the reliability of the witness'

18   identification.

19         And, finally, you may consider any other direct or

20   circumstantial evidence that may identify the person who

21   committed the offenses charged or either support or not

22   support the identification by the witnesses.

23         You have to be satisfied beyond a reasonable doubt

24   of the accuracy of the identification of the Defendant and

25   that the Defendant is the person who committed the offenses

1  before you may convict him.  If the circumstances of the

2  identification of the Defendant are not convincing beyond a

3  reasonable doubt, then you must find the Defendant not guilty.

4       It is the Defense theory of this case that Samuel

5  Vinton lent his car to a person with the initials "DA" on

6  September 9th, 2006, and that DA returned the car shortly

7  before Samuel Vinton was arrested driving it.

8       It is also the Defense theory that DA left his

9  locked black briefcase containing the ecstasy, gun, and other

10  items in the back passenger seat of Mr. Vinton's car.

11       If you find that the Government has not proven

12  beyond a reasonable doubt that it was Mr. Vinton who possessed

13  with intent to distribute the ecstasy and who used or carried

14  the gun found in that locked black briefcase, then you must

15  find Mr. Vinton not guilty.

16       The weight of the evidence is not necessarily

17  determined by the number of witnesses testifying for each

18  side; rather, you should consider all the facts and

19  circumstances in evidence to determine which of the witnesses

20  you believe.  You may find that the testimony of a smaller

21  number of witnesses on one side is more believable than the

22  testimony of a greater number of witnesses on the other side.

23       You were asked when we were selecting this jury on

24  Monday whether the nature of the charges would affect your

25  ability to render a fair and impartial verdict.  And, of

course, there was a reason for that question.  You mustn't allow the nature of the charges to affect your verdict.  You must consider only the evidence that has been presented in this case in rendering a fair and impartial verdict.

And now, I want to turn to the specific -- two specific offenses that are charged in this case.  You will note when you get back to the jury room that the indictment charges that the offenses were committed on or about September 9th, 2006.  The proof need not establish with certainty the exact date of the alleged offenses.  It's sufficient that the evidence in the case establishes beyond a reasonable doubt that the offenses were committed on a date reasonably near the date alleged.

In talking with you about the offenses themselves, I will be talking about the state of mind that must be established by the Government.  Someone's intent or knowledge ordinarily can't be proved directly, because there's no way of directly looking into the workings of the human mind.  But you may infer the Defendant's intent or knowledge from the surrounding circumstances.  You may consider any statement made or acts done or not done by the Defendant and all other facts and circumstances in evidence which indicate the Defendant's intent or knowledge.

It's entirely up to you, however, to decide what facts to find from the evidence received during the trial.

1    You should consider, as I told you, all the circumstances and

2    evidence that you think are relevant in deciding whether the

3    Government has proved beyond a reasonable doubt that the

4    Defendant acted with the necessary state of mind.

5         I'm going to define the term "possession," ladies

6    and gentlemen.  And then, as I go through the elements of the

7    two offenses, I will be using the word "possession" or

8    "possessed."  And this is the definition, the technical legal

9    definition, of that term.

10         There are two kinds of possession.  They are called

11   actual and constructive.  A person has actual possession of

12   something if he has direct physical control over it.

13         He has constructive possession of something if he

14   does not have direct physical control over it, but knowingly

15   has both the power and the intent at a given time to control

16   either by himself or through another person.

17         Possession may be shared with one or more people.

18   Mere presence near something or mere knowledge of its location

19   is not enough to show possession.  To prove possession, the

20   Government must prove beyond a reasonable doubt that the

21   Defendant had actual or constructive possession alone or with

22   someone else of the drugs, the gun, and the ammunition in

23   issue in this case.

24         The first count is possession of a controlled

25   substance with intent to distribute.  The essential elements

1    of this offense, each of which the Government must prove

2    beyond a reasonable doubt, are:  1, that the Defendant

3    possessed a controlled substance; 2, that the Defendant did so

4    knowingly and intentionally.  This means consciously,

5    voluntarily, and on purpose, not mistakenly, not accidentally,

6    and inadvertently.  And, 3, that when the Defendant possessed

7    the controlled substance he had the specific intent to

8    distribute it.

9         "Distribute" means to transfer or attempt to

10   transfer to another person.

11        The law makes ecstasy a controlled substance.  You

12   must decide whether the material in question was ecstasy.  In

13   doing that, you may consider all the evidence that may help

14   you, including the exhibits and the expert and nonexpert

15   testimony.

16        The Government need not prove that the Defendant

17   possessed any particular numerical amount of ecstasy, but it

18   must prove beyond a reasonable doubt that he possessed a

19   detectable or measurable amount of a controlled substance.  A

20   measurable amount is an amount that can be assigned a

21   numerical value, although no particular value must be proven.

22        The second count before you is carrying a firearm

23   during and in relation to a drug trafficking offense.  The

24   essential elements of the offense of using, carrying, or

25   possessing a firearm in relation to a -- I'm sorry -- let me

1  state -- say that sentence again.

2        The essential elements of the offense of using,

3  carrying, or possessing a firearm during and in relation to a

4  drug trafficking offense, or in furtherance of such a crime,

5  each one of which the Government must prove beyond a

6  reasonable doubt, are:  First, that the Defendant carried or

7  possessed a firearm; and, second, that he carried the firearm

8  during and in relation to the drug trafficking offense charged

9  in Count 1 of the indictment, or that he possessed the firearm

10  in furtherance of the drug trafficking offense charged in

11  Count 1.

12        The term "firearm" includes any weapon which will or

13  is designed to or can readily be converted to expel a

14  projectile by the action of an explosive.  The Government need

15  not prove that the firearm was loaded or operable.

16        To carry a firearm means to move or transport the

17  firearm on one's person or in a vehicle or container which the

18  person accompanies.

19        The firearm need not be immediately accessible.  A

20  person carries a firearm in a vehicle when the person

21  knowingly possesses the firearm in any location in a vehicle

22  which the person accompanies, regardless of whether the person

23  bears the firearm on their own person.

24        The phrase "in relation to" means there must be some

25  relation between the firearm and the underlying offense

charged in Count 1.  The firearm must have some purpose or effect with respect to the drug trafficking crime, such as when the gun is carried to protect drugs.

In short, a firearm is carried in relation to a drug trafficking crime if the gun facilitates that drug crime in some way or has the potential of facilitating the drug crime. You may infer that the carrying of a firearm is intended to facilitate the underlying drug trafficking crime, which you are not required to make that inference.

The phrase "in furtherance of" means the act of furthering, helping, forwarding, promoting, advancing, or progressing.  To show that the Defendant possessed the firearm in furtherance of a drug trafficking offense, the Government must show that a firearm was possessed to advance or promote the commission of the underlying offense in Court 1 of the indictment.

The mere presence of a firearm in an area where a criminal act occurs does not demonstrate that the firearm is possessed in furtherance of a drug trafficking crime.  Rather, the Government must prove, through direct or circumstantial evidence, that the firearm was possessed to advance or promote the criminal activity.

In determining whether a particular Defendant's possession of a firearm is in furtherance of a drug trafficking offense, you may consider all of the facts in

1    evidence, including the type of drug activity conducted, the

2    accessibility of the firearm, the type of firearm, whether the

3    possession of the firearm is legal or illegal, whether the

4    firearm is loaded, the proximity, or nearness, of the firearm

5    to the drugs or drug profits, and the time and circumstances

6    under which the firearm is found.

7         Those are the essential elements of the two offenses

8    with which the Defendant is charged.  We will hear closing

9    arguments from counsel, as I told you.  And then at the end I

10    will give you some very brief instructions about how you shall

11    organize yourselves in the jury room.

12         And we are ready at this time for the Government.

13         MS. MURCHISON:  Your Honor, may it please the Court.

14    During my closing arguments, I will keep my voice up.

15         THE COURT:  All right.

16         MS. MURCHISON:  Members of the jury, the evidence

17    has shown that this is a drug and gun case that Officer Alton

18    wasn't looking for.  On September 9, 2006, Officer Alton

19    wasn't expecting to find an arsenal and a pharmacy, but the

20    evidence has shown that that's exactly what happened.

21         Now, you heard testimony about what happened and you

22    heard that Officer Alton was on regular patrol when he sees

23    this car with tinted windows.  He goes to investigate the

24    tinted windows.  And you see the tint on the windows.  You see

25    that they're dark.  And you know and you'll have Government's

1    Exhibit No. 4 with you.  You'll see the tint meter that shows

2    that it's much darker than the legal limit, these windows.

3         So Officer Alton performs what he's thinking is

4    going to be a regular traffic stop, and he approaches this car

5    and.  You've heard how it had that thin blue-line sticker on

6    the back, and you'll see the exhibits that show it, as well.

7    Document Exhibit 3A, right next to the license plate, you see

8    that thin blue-line sticker.  And so when Officer Alton

9    approaches, he has a certain level of comfort, a certain level

10   of trust.

11        He asked the Defendant at that point for license

12   and registration.  Remember, you heard the testimony that the

13   exchange was pleasant, it was cordial.  There was no problem

14   at that point.

15        Even though Officer Alton had seen this knife lying

16   in plain view on the back of the Defendant's car seat --

17   you're going to remember that even though he saw this knife

18   and he got some explanation about fishing, when he didn't see

19   any other fishing gear in that car, Officer Alton wasn't

20   trying to give anybody a hard time.

21        And what did he do?  He took the knife out and he

22   left it with the Defendant on the roof of the Defendant's car,

23   because he wasn't going to arrest anybody.  In fact, he was

24   going back to his car to issue, not a ticket where you have to

25   pay money, but a warning notice for the tint.  He was going to

1    let a man with a knife, who didn't have the best explanation

2    in the world about why he had it lying there on the backseat

3    at 9:00 o'clock at night, he was going to let him go with a

4    warning.

5            Now, nobody says that the Defendant isn't a dumb

6    person.  Nobody says he isn't smart.  What did he do?  He was

7    giving all the right answers up until that point.  But you

8    heard testimony that Officer Alton talked to another officer,

9    an MPD officer.  And while they were talking about police

10   business, that officer said something that raised some

11   suspicions to Officer Alton, and so he went back to the

12   Defendant's car.

13           And once the Defendant realized -- the evidence

14   shows that once -- once Officer Alton wasn't just going to let

15   the Defendant go and accept, you know, this knife that's here

16   for fishing, not -- "no other weapons here.  I keep all those

17   things at my home."

18           No.  Once he got all these different responses,

19   Officer Alton's suspicions continue to increase.

20           And then what happened at that point?  The Defendant

21   gave these different responses first.  And Officer Alton

22   couldn't remember the order in which he gave them, but he told

23   you the Defendant said, "No, I keep all that stuff at home."

24   Then he said, "No, I don't have any weapons in the car."

25           Then he says -- back off from that a little bit, at

1    the point when Officer Alton is just not going to let up with

2    a simple ticket and citation to go on your way.

3           Then what does he say?  "Not that I know of."

4           Now, when he gets pulled out of that car and the

5    Defendant is over on the side waiting with a police officer,

6    Officer Alton's suspicions are really increased because, guess

7    what?  Now he's finding more items in his car, after the

8    Defendant told him he didn't have any.  He finds two cans of

9    mace right in the center console, right next to where the

10   Defendant had been sitting.  He finds the butterfly knife

11   under the front passenger mat, within arm's reach of where the

12   Defendant had been.

13           Now he's concerned that the Defendant has not been

14   leveling with him.  And he told you that when he saw that

15   briefcase again, the one that he saw initially when he was

16   talking with the Defendant earlier, when he saw that briefcase

17   and when he saw those earphonies, the phonies that you use

18   when you're at the firing range, Officer Alton told you

19   everything inside of him wanted to get inside of that

20   briefcase.

21           And I'm going ask you, members of the jury,

22   wouldn't -- did you think that Officer Alton was a good

23   officer if everything inside of him didn't want to get into

24   that briefcase at that point?

25           If he didn't want to use every lawful and any lawful

 1    means to get inside of the briefcase, after he stopped

 2    somebody who had given him information that's not adding up,

 3    after he's found all these other weapons, wasn't he doing his

 4    job?  Is that something he should be ashamed about that's not

 5    right, or is that the kind of officer that you think should be

 6    on the street?

 7         Now, members of the jury, you saw some of the

 8    photographs in this case, and you learned about the items that

 9    Officer Alton found inside of the briefcase.  Now, initially,

10    he saw the drugs.  But you learned about this double-fisted

11    fighting knife, as well.  And you heard about the brass

12    knuckles all inside of this briefcase.

13         And I want you to remember, it's not like Officer

14    Alton wanted to just open up and force open a briefcase.  This

15    is a combination lock.  And what did the Defendant say when

16    asked about it?  When he was offering up explanations, when he

17    was talking before he was arrested, he was saying stuff like,

18    "My girlfriend's boyfriend drives the car."

19         MS. LOTZE:  Objection, Your Honor.

20         THE COURT:  Overruled.

21         MS. MURCHISON:  He wasn't saying DA drove the car.

22         MS. LOTZE:  Objection, Your Honor.

23         THE COURT:  The objection is overruled.  You may

24    continue.

25         MS. MURCHISON:  Thank you.

1    He was saying, "I don't know.  It's not mine.  I

2  don't know what's in it."  Distancing himself from this

3  briefcase that is sitting in plain view in his car on the

4  backseat.

5    Now, members of the jury, you saw the drug evidence

6  in this case.  You saw these multiple bags of ecstasy pills.

7  And you're going to see the DEA stipulation in which the

8  parties agree that the contents of this bag -- of these bags

9  are ecstasy, and that each bag contains not less than 41

10  pills.  And then there was more.  There was more ecstasy

11  inside of the pill box.

12    Now, you heard from an expert drug witness,

13  Detective Washington, who told you that each of those pills

14  would sell on these streets for between 20 and $25 a pill.  So

15  we're looking at drugs in the amount of about $5,000.  There

16  were 243 pills in that briefcase.

17    And then you heard about what was with the

18  briefcase, what was with the drugs in the briefcase.

19    The gun, right?  And you heard about the condition

20  it was in.  Officer Alton showed you.  And he told you about

21  how there was a bullet in the chamber, how this gun was

22  cocked, how there were seven more rounds in here, how it was

23  ready to fire, how there were hollow point bullets in this

24  gun, and how it was lying right underneath the drugs.

25    So let me talk to you first about possession with

1    intent to distribute.  Now, all that means is that the

2    Defendant knew about the drugs that were inside of that

3    briefcase, and that he intended to either sell those drugs or

4    to pass those drugs to somebody else.

5         And then, when you're talking about using, carrying

6    or possessing a firearm in furtherance of a drug crime, all

7    that means is that he knew about the gun that was in the

8    briefcase, and he had it there to protect his stash, himself,

9    or as Detective Washington told you, to make sure that people

10   knew that he was armed and dangerous when he was selling his

11   drugs.

12        Now, members of the jury, you heard about all the

13   additional bullets that were found inside of that briefcase.

14   And the evidence really does show that this car had weapons in

15   every corner of it, that this is an arsenal this man was

16   driving around.

17        Members of the jury, when you look at the evidence

18   in this case, ask yourselves, who leaves $5,000 worth of

19   anything in someone's car, someone else's car?  Is that going

20   to happen?  Is that a credible defense to you?  That's not for

21   me to decide.  That's for you to decide.  But does that make

22   sense to you?

23        Members of the jury, let me tell you this:  Whoever

24   the drugs and the gun inside of that briefcase belong to,

25   whoever it belongs to, they took time to make sure that it was

1    locked under a combination.  They took time to protect the

2    drugs inside with all the weapons that were in there.  Does it

3    make sense to you that then they would leave it in someone

4    else's car?  Is that logical to you?

5           You know, members of the jury, one other thing --

6    one of the things I like about jury trials is that, you know,

7    Judge Kessler -- and I like Judge Kessler.  And Ms. Lotze,

8    she's a good defense counsel.  But every time I talk to those

9    two, we're talking about the law.

10          You, members of the jury, you bring something

11   special, something different to this case, don't you?  You

12   bring your common sense, your human experience.  So think

13   about it like this:  Imagine that, instead of drugs or a gun

14   inside of that briefcase, it was $5,000 cash or a $5,000

15   winning lottery ticket.

16          What factors would you be thinking about when you

17   had to decide, if you had to decide to whom the $5,000 lottery

18   ticket or the $5,000 cash belonged to?  You would say it was

19   in his car, it was at arm's reach.  No one else was there.

20   The car was registered to him, it was inside of a briefcase

21   that's locked right on the backseat.  You would say it was

22   his.

23          And that's what I'm saying the evidence leads you

24   to in this case.  Those items in that car on that day with

25   only the Defendant in it, those items were his.  Find the

1   Defendant guilty.

2           THE COURT:  All right.  Ms. Lotze?

3           MS. LOTZE:  Thank you.

4           Ladies and gentlemen, good afternoon.  Samuel Vinton

5   is innocent, and what happened on September 9th, 2006, is

6   that Mr. Vinton was at the studio where -- that Aaron Long

7   runs out of his house.  He was at the studio, and a band

8   member who played music with him in the past came and borrowed

9   his car.

10          DA came to the studio, picked up the keys, took the

11  car out.  Who knows who DA had in the car while he had the car

12  with him?  But when he returned the car to the studio, Samuel

13  Vinton wasn't even there yet.  Mr. Vinton was off having his

14  dinner and his get-together with Officer Teixeira, the U.S.

15  Army investigator, I believe is his title now.  They were off

16  having their meeting.

17          And when Mr. Teixeira returns Samuel Vinton to the

18  studio to drop him back off, there is Mr. Vinton's car.  You

19  know that at that point in time it's about 10, 15 minutes

20  before 9:00 o'clock, because Mr. Teixeira has had a hitching

21  pass until 9:00 o'clock when he's knowing -- he's pushing it

22  to get home by his wife-imposed curfew.

23          Mr. Vinton had time to go in, get his keys, get in

24  the car.  And, on his way home, he encountered Officer Alton.

25  That's what happened in this case, ladies and gentlemen.

1    Mr. Vinton didn't possess that briefcase that DA put

2  into his car while DA had the car.  Mr. Vinton didn't even

3  know it was there.  And, you know -- the Government says, "Oh,

4  does it make sense that someone would leave behind something

5  so valuable?"  We'll get in a minute to why that's not the

6  appropriate question for you to answer.

7    But let me say this:  You heard from Aaron Long that

8  he expected Mr. Vinton to come right back, and what else?

9  That DA told him he better come right back.  Do you recall

10  that testimony?

11    That's exactly what DA said to Mr. Vinton as he was

12  leaving.  DA wasn't trusting his goods off into the world for

13  who knows how long.  He expected that they'd be coming right

14  back to him.  And DA didn't have a way to get around of his

15  own that night.  He had been borrowing Mr. Vinton's car.

16    Now, Samuel Vinton is not a drug dealer.  You'll

17  have the registration of his vehicle, and you'll see that that

18  registration shows he's driving around in a 2001 Nissan

19  Maxima.  He's been working off and on since 2004 at the Red

20  Lobster restaurant waiting tables.

21    Now, before I became a lawyer, I worked at a

22  Blackeyed Pea as a waitress.  And I tell you what.  I lasted

23  about one week as a waitress, and then I begged to be given

24  some other duty.  And I was -- I think I hostessed.  I was

25  made a hostess, because I couldn't hack being a waitress.

1    It's hard work.  It's hard work remembering what meal goes to

2    which person, running back and forth to the kitchen, trying to

3    keep everyone happy.  It is not an easy job.

4           Why, if you're making the kind of profit that

5    Detective Washington told you a person selling drugs can make,

6    would you bother with 10-hour shifts of hard work six days a

7    week?  Why would you put up with that pay when you're making

8    money hand over fist tripling your profit?

9           Detective Washington said you could spend 7 or $8 to

10   get some ecstasy pills wholesale, and you can sell those same

11   pills for 20 to $25.  Think about it.  For 200 pills, you're

12   paying $1,600.  And for those pills, conservatively, you might

13   make $5,000.  Why on earth would you be running back and forth

14   to the kitchen at the Red Lobster for 10 hours on end six days

15   a week?  Why?  Because Mr. Vinton isn't a drug dealer.

16   Because Mr. Vinton is not the person making money hand over

17   fist selling ecstasy pills.

18          Mr. Vinton lives above a church with his

19   grandparents and his mother.  Mr. Vinton is not a drug dealer,

20   ladies and gentlemen.  And Mr. Vinton, after his vehicle was

21   returned to the studio and after Mr. Teixeira dropped

22   Mr. Vinton back off at the studio, gets into his 2001 Nissan

23   Maxima and drives where?  On a route towards the church, where

24   he lives.

25          Now, it's a Saturday night at 9:00 p.m.  Detective

1    Washington told you that those drugs bring in the kind of

2    money they bring in at the raids at the clubs.  Mr. Vinton was

3    not at a raid or a club at 9:00 p.m. Saturday.  He's on his

4    way to a church, and that's because Mr. Vinton isn't out there

5    possessing with intent to distribute ecstasy.

6              Now, as he's driving minding his own business,

7    Officer Alton pulls Mr. Vinton over.  And truthfully, really,

8    it's neither here nor there whether Officer Alton acted

9    reasonably that night.  But there has been a lot of testimony

10   elicited and a lot of argument that you heard right now about

11   how reasonable Officer Alton behaved.  And so let's just spend

12   a minute and talk about that.

13             Officer Alton encountered Samuel Vinton driving in

14   that car with the tinted windows.  When he pulled Mr. Vinton

15   over, first of all, for starters, Mr. Vinton is at a red light

16   and some police cruisers speed by in front of him.  He has

17   some choices at that point.

18             He can go on around the circle and not follow behind

19   the police activity.  He could wait for the light to turn

20   green to put some more distance between himself and the

21   police.  And what does Mr. Vinton do?  He turns right on red

22   to follow in the same direction as all those police cars.

23             Now, the Government, you'll recall in its opening

24   statement, told you Mr. Vinton sped off after the police,

25   after the red light, and that Officer Alton had to get behind

1    him.

2              You didn't hear any testimony like that, ladies and

3    gentlemen.  Just the opposite.  Mr. Vinton, you'll recall, was

4    driving along and some more police sped by him, and he pulled

5    over and let them pass.  And then he continued on his way, and

6    Officer Alton pulls him over.

7              And what does Mr. Vinton do?  He's seated in the car

8    with all of those heavily tinted windows that you saw, with

9    the protection of those tinted windows to keep the police from

10   seeing into his vehicle.  What does he do?  He rolls them

11   down.  Why?  Because he doesn't know that there is a briefcase

12   filled with drugs and a gun sitting in the backseat.

13             He's calm, he's polite, he's cooperative, and he's

14   not nervous to be interacting with the police.  Why?  Because

15   he doesn't know that there's a briefcase filled with drugs and

16   a gun in the backseat of his car.

17             Now, Mr. Vinton answers the police questions as best

18   he can.  This officer is interested in this sticker on his

19   car.  You know, he evidently has to explain to Mr. Vinton the

20   thin blue line has something to do with law enforcement.

21             "Did you ever work in law enforcement?"

22             And Mr. Vinton says, "I worked in personal

23   security."

24             He then he was asked -- ladies and gentlemen, in the

25   space of less than five minutes, he is asked three different

1    times, "Are there any weapons in the car?"  Three different

2    times in less than five minutes.  He sees the knife.

3    Mr. Vinton tells him what the knife is about.

4              "Are there any other weapons in the car?"

5              "No."

6              Less than five minutes later, "You sure there's no

7    other weapons in the car?"

8              "No."

9              Now, it must be less than three minutes after those

10   questions, "Now, I'm going to get you out of the car to search

11   the car.  Are there any other weapons in the car?"

12             "Not that I know of."

13             Completely reasonable.  The first two "nos" didn't

14   seem to satisfy him, so let me try another truthful response.

15   "Not that I know of."

16             There is nothing wrong with that, ladies and

17   gentlemen, and there is no evidence that Mr. Vinton wasn't

18   telling the truth.  There is a butterfly knife, as it turns

19   out, that looks like this (indicating), hidden underneath the

20   passenger floorboard that, sitting in the driver's seat, you

21   might not even know about.

22             There is some mace, which is not a weapon.  Officer

23   Alton told you it's a personal security device, and there is

24   nothing illegal about it, in the console.  So when he's asked,

25   "In addition to this knife, are there any other weapons?"

1        His response, "No."

2        The mace is not an illegal -- is not an illegal

3    weapon.  It's not a weapon at all.  And the butterfly knife he

4    could not have known about.

5        Now, again, the Government's made a lot of how

6    Officer Alton was looking for this and how Officer Alton

7    behaved perfectly reasonably.  Ask yourselves if, at that

8    point, say it had been me in that car.  If Officer Alton --

9    and I gave the best responses that I could to the questions,

10   and I explained about the fishing knife in the backseat --

11   would every bone in Officer Alton's body have wanted to search

12   the briefcase in the backseat of my car?  Ask yourselves.  And

13   I think the answer is --

14        MS. MURCHISON:  Objection, Your Honor.

15        THE COURT:  Objection is overruled.

16        MS. LOTZE:  I think the answer is plain, that

17   Mr. Vinton was treated differently than I would have been.

18        Now, for some reason, these responses to the

19   repeated questions about the weapons caused Officer Alton to

20   want to take Mr. Vinton out of the car, place him in

21   handcuffs, call for backup, and invite MPD to call for backup

22   for themselves.

23        55 minutes go by and Mr. Vinton, who up until the

24   time he was put in handcuffs and removed from the car and made

25   to sit on the curb, was completely cooperative and nice about

 1    the interaction and has lost patience.

 2             55 minutes, ladies and gentlemen, before Officer

 3    Alton got into that briefcase and had a reason to bring this

 4    case.  55 minutes.  So, I mean, again, Officer Alton's

 5    reasonableness or unreasonableness is neither here nor there

 6    for your determination about whether or not the Government has

 7    proven beyond a reasonable doubt that Mr. Vinton possessed the

 8    items in that briefcase.  But since it's been made a big deal

 9    out of it, let's just take a minute and address reality here.

10    That's not reasonable.

11             Now, I want to set aside for a minute the

12    evidence -- well, first, before we set it aside, let's talk

13    for a minute about what you heard this afternoon from Aaron

14    Long and from Bruce Teixeira.  Because the Government would

15    have you believe -- and I'm confident you will hear more about

16    this in a minute -- that the defense just doesn't make sense,

17    that the defense is incredible, is what I heard a moment ago.

18             Well, ladies and gentlemen, if Mr. Vinton wanted to

19    bring some witnesses down here to spin some kind of story for

20    you, some kind of defense that would be sure to get him off,

21    couldn't he have done a better job?  Wouldn't it have been

22    better to have a witness to say, for instance, with Aaron

23    Long, "Yes, I saw DA holding that briefcase."  Wouldn't that

24    have been the evidence that you'd want to bring down here if

25    you're just producing things that will help a person get off?

1        Aaron Long testified truthfully, and he testified

2    only to what he saw.  He didn't try to add to the story.

3        MS. MURCHISON:  Objection, Your Honor.

4        THE COURT:  Objection is overruled.  Go ahead.

5        MS. LOTZE:  Because he simply told you what he saw.

6    Aaron Long saw DA come, saw the car borrowed, saw it brought

7    back.  Bruce Teixeira, the only cross-examination from him

8    was, well, Bruce Teixeira corroborates Mr. Long, because he

9    knows DA, knows him to have been in the band with Mr. Vinton,

10   and they corroborate each other importantly on this point.

11       Mr. Teixeira recalls specifically that it was just

12   before 9:00 o'clock that he let Mr. Vinton off in front of the

13   studio.

14       And Mr. Long tells you, "I can't remember the time.

15   It was dark."  He sees Aaron Long, although he doesn't know

16   it's Bruce Teixeira driving, sees the car that Bruce Teixeira

17   describes himself to have been driving.

18       Completely consistent, ladies and gentlemen, and in

19   this case, perhaps unnecessary.

20       Why do I say that?  Because let's set aside the

21   Defense evidence for a moment and talk about what part the

22   Government's evidence proved, because that's the way you

23   analyze this case.

24       The question for you is not, "Gee, does it make

25   sense that a person would leave behind a briefcase?"  The

1   question for you is, "Has the Government proven beyond a

2   reasonable doubt that Mr. Vinton possessed the items in that

3   briefcase?"

4          The Government's evidence, ladies and gentlemen,

5   was, one, there is a person's fingerprint on the items in that

6   briefcase that is not Samuel Vinton's.  Now, that's important

7   in and of itself, because we know that somebody else touched

8   the items in that briefcase.  And you don't have any evidence

9   that Mr. Vinton touched anything in that briefcase.

10         It's important for another reason, ladies and

11  gentlemen.  Because, as the Government took pains to point

12  out, there are some gloves here on the front passenger seat of

13  Mr. Vinton's car.  These black gloves right there

14  (indicating).

15         So, plainly, the person who's handling the evidence

16  inside the briefcase is not wearing any gloves, because there

17  were partial prints left on the ammunition and partial prints

18  left on other items, and a full print left on the knife

19  itself.  So, plainly, the person who possessed it and handled

20  those items is not wearing gloves, and that person is not

21  Samuel Vinton.

22         One other reason you know that is because Mr. Vinton

23  had some gloves sitting right there.  Do you think if that was

24  his stuff he would have taken the time to put on the gloves

25  and handle what was in the briefcase?  That's the suggestion,

1    "Oh, these gloves would be a barrier against leaving prints."

2            Now, the Government's case also completely leaves

3    unanswered -- there's absolutely no evidence been presented

4    from the Government to connect Mr. Vinton to that briefcase.

5    And you heard the judge's instruction a moment ago and you, of

6    course, have to consider the instruction as a whole.  But I

7    want to highlight for you something that you should be very

8    mindful of.  And that is, mere presence near something, or

9    mere knowledge of its location, is not enough to show

10   possession.

11           To show possession, the Government must prove beyond

12   a reasonable doubt that the Defendant knowingly had both the

13   power and intent at a given time to control it, "it" being the

14   items in that briefcase.

15           What evidence has the Government produced for you to

16   suggest or to prove beyond a reasonable doubt that Mr. Vinton

17   knowingly had possession, the power and the intent at a given

18   time to control the items in that briefcase?  Absolutely none.

19   There is not anything belonging to Mr. Vinton, with his name

20   on it, in the briefcase.  There is not any indication that he

21   made any motions toward the briefcase.  There wasn't a single

22   witness that testified that they ever saw Mr. Vinton with the

23   briefcase or with the items inside it.  Absolutely nothing

24   beyond mere presence.  That's it.

25           That's the Government's case, ladies and gentlemen.

1    Bruce Teixeira gives you reason to doubt the Government's

2    case.   Aaron Long gives you reason to doubt the Government's

3    case.   But even without them, you have reason to doubt the

4    Government's case just based on the evidence and the lack of

5    evidence that the Government provided.

6              Now, we've talked about -- we talked about some of

7    the evidence in the case, and I wanted to highlight just a

8    couple of other things for you.   Let me just start this way:

9    There was a point in the trial where I asked Officer Alton

10   about the two pieces of paperwork that he found in the car.

11   One was a traffic ticket and one was a receipt for some car

12   work, an oil change, maybe.   And you'll recall that it was me

13   who asked about that paperwork.

14             Now, as it turns out, both of those things had

15   Mr. Vinton's name on it, and they were for dates not

16   September 9th.   I think they both were in August of 2006.

17   But isn't that the kind of thing that you'd like to have

18   evidence about in determining whether Mr. Vinton is the only

19   person who uses the car, whether there are other people who

20   used the car?   Isn't that the type of evidence that's useful

21   to you in making this very important decision?

22             Because, make no mistake, this is a very serious

23   matter to Mr. Vinton.   And your decision of it will impact him

24   immensely.   But rather than produce for you any actual

25   evidence like that, are there any documents in the car with

1   somebody else's name on it?  Is there any DNA evidence to link

2   anyone else to the car?

3            Rather than focus on any of that actual evidence,

4   the Government has directed your attention to four points --

5   really, sort of three points, one with two subparts -- that

6   it says -- proves to you that Mr. Vinton possessed these

7   items.

8            And those four points -- three really with some

9   subparts -- are his inconsistent answers with respect to the

10  weapons in the car.  And we talked about that already.  And

11  it's perfectly reasonable, I submit, that a person who has

12  already answered the same question once -- the same question

13  twice one way, will try a different response on the third

14  occasion.

15           Then the Government says, "Well, he had earphones."

16  Now, that proves to you that he's the person who possessed the

17  gun in that briefcase.  But remember, ladies and gentlemen,

18  that Officer Alton didn't even recover the earphones, didn't

19  photograph the earphones.  Why?  Because they were so

20  inconsequential, it didn't strike him that they were even

21  evidence to collect as evidence.  And, naturally, ladies and

22  gentlemen, that would be the response.  They are earphones

23  with a hundred perfectly lawful uses, not the least of which

24  might be as a sleep aid if you live right next to the railroad

25  tracks which, as you've seen on the photograph and on the map,

1    Mr. Vinton does.

2            Then the Government says, "Well, Mr. Vinton had a

3    knife and some mace in the car."  Ladies and gentlemen, what

4    drug dealer protects his valuable property with mace and a

5    knife, I ask you.

6            You heard Detective Washington.  And Detective

7    Washington told you guns and drugs go together.  Detective

8    Washington didn't say drug dealers are running around the city

9    protecting their stuff with a knife and some mace.  And you

10    know better, ladies and gentlemen.

11            The person who possessed with intent to distribute

12    that valuable ecstasy possessed that gun.  What good is that

13    gun going to do Mr. Vinton as he drives the car?  The gun is

14    in an attache case that's velcro closed in a locked briefcase

15    in the back of the car.  That gun is not doing Mr. Vinton any

16    good if someone comes to try to steal that briefcase, not any

17    good.  He can't get to it.  He can't quickly defend himself or

18    his valuable goods.  That gun belonged to the same person who

19    possessed the ecstasy who possessed that briefcase.

20            And if the Government -- you know, the Government --

21    it's curious what they are making of the knife and the

22    explanation that Mr. Vinton gave.  I mean, first of all,

23    Mr. Vinton says, "That's the knife I use when I go fishing

24    with my grandfather."  You heard that the police encountered

25    the grandfather, didn't bother to ask him, is that a --

1         MS. MURCHISON:  Objection, Your Honor.

2         THE COURT:  Sustained.

3         MS. LOTZE:  Well, rather than investigate that claim

4    in any way, ladies and gentlemen, I guess the Government wants

5    you to believe that Mr. Vinton is lying about that.  So let's

6    follow that a moment.

7         If Mr. Vinton is lying about using the knife for

8    fishing, what is he using it for?  I guess the Government's

9    suggestion to you is he's using it to defend himself or to

10   defend his drug trade.  That's the suggestion.  He has it for

11   protection because he's a drug dealer.

12        Well, first of all, ladies and gentlemen, I mean,

13   again, it's a knife that has a sheath that's closed on.  And

14   it's also -- if that's the suggestion, and they also want you

15   to believe that Mr. Vinton possesses all the items in that

16   briefcase -- then Mr. Vinton has three knives to protect

17   himself and his drug trade.  How is that going to work?  He

18   doesn't even have enough hands to pull all the knives that

19   they want you to believe that he has for some unlawful

20   purpose.

21        It just doesn't all hang together, ladies and

22   gentlemen, because it wasn't Mr. Vinton who possessed with

23   intent to distribute that ecstasy and who used -- carried that

24   handgun.

25        Those are really -- those are really the three --

1    the four categories of things that the Government has pointed

2    to you, to suggest that it's proved its case in this very

3    serious matter against Mr. Vinton.  The earphones, the fact

4    that he had a knife, with some mace, and that he gave what the

5    Government thinks is a big deal, these inconsistent answers

6    with respect to the weapons.  And, instead of producing for

7    you any actual convincing tangible evidence, that's what they

8    want you to focus on.

9            But, ladies and gentlemen, when you go back to

10    determine the case and to deliberate the matter, you'll find

11    yourselves wishing for more or better evidence.  Because,

12    let's face it, what the Government brought you was simply that

13    a person is merely present with the items that he's -- that

14    the Government has to prove to you beyond a reasonable doubt

15    that he possessed.

16            When you find yourselves wishing for more or better

17    evidence, I'd ask you to take a look at the Government's

18    exhibits in this case.  I would ask you to take a look at

19    Government's Exhibit No. 5.  Right there on the back passenger

20    seat, right where the briefcase would have been, is this

21    yellow piece of paper.  Officer Alton tells you, "I don't

22    think anyone ever looked at that."

23            Would it be useful to you to know whether there was

24    someone else's name on that piece of paper?  Would it be

25    useful to you to know that the Government had bothered to take

1    that piece of paper and submit it for the type of fingerprint

2    analysis that Irma Valdez has told you is possible?  Would you

3    like to have had some actual physical evidence about who else

4    may have left prints in the car?

5           Would it have been useful for you to have the

6    Government collect or inspect or investigate the paperwork

7    under the gloves in the front seat of the car?  Would you like

8    to know whether there is any other person's fingerprints on

9    that paperwork?  Or how about anybody else's name on that

10   paperwork?

11          That's the type of evidence, ladies and gentlemen,

12   that is useful to you in making this important decision.  Not

13   whether there are earphones in the car, not did he give some

14   different answers about weapons, but actual physical evidence

15   that would be helpful in making this important decision.

16          And, you know, the Government's under no obligation

17   to conduct that type of investigation.  They aren't under any

18   obligation, for instance, to test the cup right here with the

19   straw in it that someone, seated in the front seat of car, had

20   to have been drinking out of.  They are under no obligation to

21   test that cup for DNA, figure out who might have been in the

22   car once and for all.

23          That's the type evidence that would be useful for

24   you.  And, although the Government doesn't have to present it,

25   you can take their failure to investigate this matter into

account.  And when the Government asks you to return verdicts

of guilty in this very serious matter, and yet the Government

hasn't bothered to investigate the case and to fingerprint the

evidence in the case and to submit for DNA analysis the

evidence in the case, then your answer to that, ladies and

gentlemen, is to find Mr. Vinton not guilty.

          If the Government fails to produce to you evidence

that is convincing beyond a reasonable doubt, then you find

Mr. Vinton not guilty.  And let's make no mistake.  The

Government was on notice since September 9th of 2006 that

Mr. Vinton was disputing, substantially disputing, that he had

anything to do with that briefcase.  He told police that

night, "That is not my briefcase.  I don't know what's inside

it."  He told police that night, "Other people drive my car."

          And this suggestion, ladies and gentlemen, that

Mr. Vinton was under some obligation to tell Officer Alton,

after the way he had been treated that night, "Listen, I

loaned my car to DA," what do you think would have been made

of that?  This officer who didn't bother, and the Government

who didn't bother after that, to submit for analysis any of

the physical tangible proof, do you think that they would say,

"Oh, okay, let's go to see DA."  Do you think that would have

served Mr. Vinton well, ladies and gentlemen?

          He did provide an explanation, and Officer Alton

can't even recall what it was specifically.  That's how

1    seriously Officer Alton took Mr. Vinton's explanations that

2    night.

3           And let's make no mistake about this, ladies and

4    gentlemen.  Mr. Vinton is under no obligation whatsoever to

5    prove to you that he's innocent.  Mr. Vinton could have said

6    in response to this evidence presented by the Government, "All

7    that they have is mere presence."

8           And I could have stood before you and said, "That's

9    all they have, ladies and gentlemen.  Find him not guilty."

10           Instead, Mr. Vinton, because this is a very

11    important decision, produced for you evidence that someone

12    else used the car.

13           Now, as you go back there to deliberate, the

14    question is not, "Has Mr. Vinton proven to you that DA left

15    the briefcase in the car?"  That is not the question.  The

16    question is whether the evidence presented gives you reason to

17    doubt that the Government has proven that it was Mr. Vinton

18    who possessed those items.

19           You know that it has, ladies and gentlemen, and I am

20    confident that after you've considered all of the evidence in

21    this case, the evidence there is and what evidence there

22    simply is not, you'll return the only fair verdict.  And we

23    ask you to find Mr. Vinton not guilty.

24           Thank you.

25           MS. MURCHISON:  You know, members of the jury, I was

sitting here listening to Ms. Lotze, and there are a few
things that I want to clear up.

First, the Defense didn't have to prove a defense in
this case.  But they did, didn't they?  And so when you're
looking at all of the evidence in this case, you've got to
think about all of the testimony that you heard.

Now, Ms. Lotze was talking about the Defense theory
of the case is that DA left this briefcase inside of the car.
But, members of the jury, ask yourselves:  What evidence have
you heard during this trial that DA ever had a briefcase in
the backseat of that car, that DA ever touched a briefcase?
The evidence from their witness, Mr. Long, was that he never
saw -- he didn't recall seeing him with any briefcase.  He
recalled the little lock, but no briefcase.

There is no record on -- there is no record -- no
evidence on this record that DA ever had a briefcase or that
he ever put a briefcase inside that Defendant's car.

What other witnesses did they call?  Mr. Conway, an
employer maybe, sometimes, somehow.  He doesn't even know if
the Defendant was working at Red Lobster back on September 9,
2006.  And if the Defendant does work there, ask yourselves:
What kind of cover is there for a drug dealer who distributes
in wholesale?  What person has a job that they can leave, not
work at, back and forth, sometimes on, sometimes off, and
still say that they worked there for four years?

1          Members of the jury, Defense Counsel said that the

2    Government fell short, they didn't submit any of the physical

3    evidence for testing.

4          Is that what the evidence showed in this case?

5    That's not what the testimony was.  The testimony was that

6    all of the items inside of that briefcase were tested.  That

7    means the gun, that means the ammunition, that means the drug

8    packaging, that means the magazine for the gun, that means

9    the double-sided fighting knife, that means the brass

10   knuckles.  And you heard that, from all of that evidence,

11   only six prints were lifted.  And they weren't lifted from a

12   bunch of different items inside of a briefcase.  There were

13   no fingerprints found on the gun, there were no fingerprints

14   found on the gun magazine, there were no fingerprints found

15   on the brass knuckles.

16         The only fingerprints were five off of this

17   double-sided fighting knife and one off of one of the bullets.

18   And you heard during this testimony that only one, one from

19   the knife, was of value.

20         Now, members of the jury, let's not engage in a

21   circus life here, right?  Somebody put this briefcase in the

22   Defendant's car.  And the fact that no fingerprints are

23   recovered from the briefcase or from the items inside, except

24   for one, doesn't mean that no one touched it.  Somebody had to

25   touch it to put it inside.  All that means is that the only

print of value was found off of this knife.  And you heard

from the fingerprint examiner that she can't determine whether

the other five prints that were recovered form this knife were

or were not the Defendant's.

There was not enough information left on those

partial prints to determine whose they were.  And the one that

was on there that was not the Defendant's, there is no way to

determine when that was left or how many people touched the

knife before it went into the Defendant's car before he took

it.

Now, members of the jury, Defense Counsel suggests

that the straw in the car should have been tested for DNA and

that a piece of paper in the backseat that wasn't even inside

of the briefcase should have been tested.  But ask yourselves,

"Okay.  If that had been done, would that put us in a

different situation than we're here now?"

You know that that was the Defendant's car.  You're

going to see his registration.  It was registered to him for a

long time.  So if that had been his saliva that was found on

the straw, would that mean that he did it, to you?  Would that

be more evidence for you that shows that this was his

briefcase?

We already know that's his car.  If there had been a

fingerprint on some papers found in the backseat, does that

mean now that he did it?  No.  No surface logic here.  We've

1    got to think, "That doesn't make sense."

2            Now, during Defense closing -- no, during her

3    opening, she said to you that this case was just like a

4    snapshot.  But I want to ask you, members of the jury, don't

5    you know that a picture is worth a thousand words?  And what

6    picture of the Defendant do you have in this case?

7            Now, you know that the amount of drugs in the

8    briefcase means that whoever left it in there intended to

9    distribute; possession with intent to distribute.

10           Let me give you an example.  You go to McDonald's,

11   and you see somebody ordering 243 hamburgers.  Even though you

12   don't know who they're getting them for, you know they're not

13   going to eat them for themselves.  They're going to share

14   them, give them away, do something else.  That's too many.

15   Okay?

16           So the evidence in this case was that those drugs

17   were intended for distribution, that that gun was there to

18   protect it.

19           And Defense Counsel has it wrong.  The mace and the

20   knives that were inside the car, the significance of that is

21   that Detective Washington told you some drug dealers have

22   items for show.  The gun is for protection.  The knives, the

23   mace, are for show.

24           I'm not saying he's trying to protect himself with

25   mace.  What I'm saying is that he's got that briefcase close

1    by.  And, with the turn of the lock, the combination, he can

2    get right into it.  It's in arm's reach, and it's there for a

3    reason.

4           Now, members of the jury, I think you have to ask

5    yourself this, too.  And I've been thinking about this.  In

6    the middle of a case about drugs and guns, why are you hearing

7    so much testimony about the fact that the Defendant lived

8    above a church, that he plays in the choir?  I mean, what does

9    that have to do with this case?  Could it be that that's

10   offered to try to make you feel sorry for him, speculate about

11   him?

12           MS. LOTZE:  Objection, Your Honor.  Objection.

13           THE COURT:  Objection is overruled.

14           MS. MURCHISON:  Speculate about why he wouldn't do

15   it, why you shouldn't believe this about him?  What's the

16   purpose in that?  Make you wonder and think, "Well, maybe DA

17   did do this, and I might find that he did that, even though

18   there is no evidence on the record he had a briefcase."

19   What's the purpose of that evidence?

20           Members of the jury, what I'm telling you is that

21   that the Defendant possessed the drugs.  He possessed the gun.

22   Defense Counsel says look to me.  Yes, look to me.  The burden

23   is on me in this case to prove beyond a reasonable doubt that

24   he's guilty of these offenses.

25           But listen to me, and listen to me carefully.  The

1   Government is not required to prove beyond all reasonable

2   doubt that the Defendant is guilty.  We're required to prove

3   beyond a reasonable doubt.

4       Do you understand what that means?  That means that

5   unless we all missed something, there are things about this

6   case that we will never know, because we weren't there on

7   September 9, 2006.  But when you ask yourselves, would you

8   have liked to have known this, and what is the answer to that,

9   that doesn't mean you have a reasonable doubt about whether or

10  not the Defendant knew about these drugs and they belonged to

11  him.  That means that you wish you had some other evidence.

12  But the evidence is what it is, and the evidence is enough

13  here.

14      Defense Counsel says, "Look to the Government.  They

15  can't show -- they want you to just believe."  And she says

16  there are these little three categories and some

17  subcategories.  What is she talking about?

18      Let me tell it to you straight.  I'm just going to

19  tell the facts here, members of the jury.  What is the

20  evidence that the Defendant knew about the contents of

21  briefcase?

22      First, he acknowledged the things on that backseat

23  right next to the briefcase.  He knows about the earphones.

24  He knows about the knife.  But he doesn't know about the

25  briefcase?  Does that make sense?

1           No. 2, members of the jury, what would be the

2    reaction of an innocent person?  When Officer Alton says,

3    "What's in the briefcase?"  Would it be, "What briefcase?

4    What are you talking about?  That's DA's briefcase.  I don't

5    know."

6           MS. LOTZE:  Objection, Your Honor.

7           THE COURT:  Sustained.

8           MS. MURCHISON:  It wasn't, "What briefcase?  What

9    are you talking about?"  It was, "I don't know.  It's not

10   mine.  I don't know what's in it."

11          Members of the jury, what about the Defendant's

12   implausible explanation?  It's not just the fact about he gave

13   different responses about whether he had weapons in the car.

14   And make no mistake about it.  He said he didn't, and then he

15   did.  It's not that he gave different responses about whether

16   he did, it was his explanation about why he had those items.

17          Knife?  No fishing equipment.  9:00 o'clock at

18   night.  Earphones.  Sleep aid?  We're not at home.  The

19   earphones are in the car, not by the railroad tracks near his

20   house.  No other weapons?  You find mace and knives.

21          And, members of the jury, what about the gloves in

22   September?  Remember, no fingerprints found on any of this

23   evidence.  The fingerprint examiner told you reasons why

24   either a print won't be left or a print that is left would be

25   destroyed.  And you heard explanations about that, including

1  the fact that there were these gloves sitting on the front

2  seat in that Defendant's car on September 9th.

3          Members of the jury, the drugs and the gun belong to

4  the person with the earphones and the gloves.  Do your duty.

5          THE COURT:  Can you hold on a couple of more

6  minutes?  I'll be brief.

7          When you go back to the jury room, ladies and

8  gentlemen, not today, tomorrow morning first thing,

9  9:00 o'clock, you should select a foreperson to preside over

10  your deliberations and be your spokesperson here in court.

11          There aren't any specific rules about how you go

12  about selecting a foreperson.  That's up to you.  But be

13  mindful of your mission, to reach a fair and just verdict

14  based on the evidence.  Consider whether you're selecting a

15  foreperson who will be able to facilitate your discussions,

16  who can help you organize the evidence, who will encourage

17  civility and mutual respect, and who will invite each juror to

18  speak up regarding their views about the evidence, and who

19  will promote a full and fair consideration of the -- of all of

20  that evidence.

21          The verdict must represent the considered judgment

22  of each juror, and it has to be unanimous.  In other words,

23  each and every one of you have to agree to it.

24          A separate offense is charged in each of the two

25  counts.  Each offense and the evidence which applies to it

1    should be considered separately, and you should return

2    separate verdicts as to each count.  And I will be including a

3    verdict form with my written instructions.

4           The fact that you may find the Defendant not guilty

5    or guilty on any one count of the indictment does not control

6    or influence your verdict with respect to the other count of

7    the indictment.

8           I'm not going to be sending all the exhibits back

9    with you into the jury room, but you are entitled to see all

10   of them as you deliberate, if you wish to.  I suggest that

11   tomorrow you begin your deliberations, and then you can ask

12   for any or all of the exhibits which have been admitted into

13   evidence, simply by sending me a note through the marshals,

14   who will be right outside the jury door during your

15   deliberations.

16          The question of possible punishment of the

17   Defendant, in the event of conviction, is no concern of yours.

18   It should not enter into or influence your deliberations in

19   any way.  The duty of imposing sentence, in the event of

20   conviction, rests exclusively with me.

21          You should weigh the evidence in the case and you

22   should determine the innocence or guilt of the Defendant

23   solely on the basis of that evidence without any consideration

24   of the matter of punishment.

25          If you need to communicate with me at all, just send

1    a note in, have your foreperson sign it, have your foreperson

2    put the time and the date on it.  And of, course, put whatever

3    question or concern you have.

4            Do not indicate in that note what the jury's verdict

5    is, and do not indicate in that note whether the jury is

6    leaning either way.  In other words, don't tell me that there

7    are four votes this way and six votes that way.  I'm not

8    supposed to know anything about your deliberations.

9            When you've reached a verdict, just sent me a note

10   telling me you've reached it, have your foreperson sign it,

11   and send it in.  Don't tell me what the verdict is, and then

12   your foreperson will announce the verdict in open court.

13           One final thing I want to tell you.  Don't be

14   surprised when you return your verdict if one or both of the

15   parties asks that the jury be polled.  That is simply to make

16   sure that your verdict and your vote is a unanimous one.  If

17   it's asked for, I'll just go down the row.  I'll call on each

18   of you individually.  I will ask whether you agree or disagree

19   with the verdict announced by your foreperson, and all you

20   will reply is whether you do agree or disagree.

21           Now, I just tell you that now, so that you're not

22   surprised if a poll is asked for.

23           Ladies and gentlemen, now, we've had a long day and

24   you've heard a lot.  Put the case out of your minds.  Stop

25   thinking about it.  Clear your heads.  Have a pleasant

1    evening.  Be here at 9:00.  Coffee will be ready for you and

2    tea, I think.

3         Don't -- of course, don't talk about the case

4    tonight with anybody.  Don't talk about it with each other

5    until tomorrow morning, when Ms. Hightower will be here.

6    We'll give you the exhibits, we'll give you the written

7    instructions.

8         And, finally, as I said, just rest your minds

9    overnight, so that you can start fresh and clear tomorrow

10   morning at 9:00 o'clock.  And I will see you in the morning,

11   ladies and gentlemen.

12         (PROCEEDINGS END AT 10:52 A.M.)

13                         *-*-*-*-*

14

15

16              **CERTIFICATE OF REPORTER**

17         I, Catalina Kerr, certify that the foregoing is a

18   correct transcript from the record of proceedings in the

19   above-entitled matter.

20

21

22

23

24   _____   _____
     Catalina Kerr                 Date

25